Sarah Spinuzzi (Bar No. 305658)
Email: sarah@coastkeeper.org
Erin Barlow (Bar No. 342212)
Email: erin@coastkeeper.org
ORANGE COUNTY COASTKEEPER
3151 Airway Avenue, Suite F-110
Costa Mesa, California 92626
Telephone: (714) 850-1965

*Attorneys for Plaintiff Orange County Coastkeeper*

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ORANGE COUNTY COASTKEEPER, a California nonprofit public benefit corporation, <br><br> Plaintiff, <br> v. <br><br> THORNTON STEEL & IRON WORKS, INC., a California corporation; and KENNETH DALE THORNTON, <br><br> Defendants. | Civil Case No. <br><br> **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES** <br><br> **(Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 *et seq*.)** |

Orange County Coastkeeper ("Coastkeeper" or "Plaintiff"), by and through counsel, hereby alleges:

### I.    **JURISDICTION AND VENUE**

1.    Plaintiff brings this civil suit under the citizen suit enforcement provision of the Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 *et seq*. (the "Clean Water Act" or the "CWA"). *See* 33 U.S.C. § 1365.

2.    This Court has subject matter jurisdiction over the parties and this action pursuant to 33 U.S.C. § 1365(a)(1) and 28 U.S.C. §§ 1331 and 2201 (an action for declaratory and injunctive relief arising under the Constitution and laws of the United States).

3.    On July 16, 2024, Plaintiff issued a 60-day Notice of Violation and Intent To Sue letter (the "Notice Letter"), attached hereto as Exhibit A and incorporated by reference

herein, to Thornton Steel & Iron Works, Inc. ("Thornton Steel"), and Kenneth Dale Thornton ("Thornton") (collectively, "Defendants"), as the owner(s) and/or operator(s) of the Thornton Steel & Iron Works, Inc. facility located at 1323 S. State College Parkway, Anaheim, CA 92806 (the "Facility"). The Notice Letter informed Defendants of the violations of the CWA, and California's General Permit for Discharges of Storm Water Associated with Industrial Activities (National Pollutant Discharge Elimination System ("NPDES") General Permit No. CAS000001, Water Quality Order No. 97-03-DWQ, as amended by Order No. 2014-0057-DWQ, as amended by Order No. 2015-0122-DWQ, as subsequently amended by Order No. 2018-0028-DWQ (effective July 1, 2020) (hereinafter, the "General Permit" or "Permit") at the Facility. The Notice Letter informed Defendants of Plaintiff's intent to file suit against Defendants to enforce the CWA and General Permit.

4.    The Notice Letter was also sent to the Attorney General of the United States Department of Justice ("USDOJ"), the Administrator of the United States Environmental Protection Agency ("EPA"), the Regional Administrator of EPA Region 9, the Executive Director of the State Water Resources Control Board ("State Board"), and the Executive Officer of the Regional Water Quality Control Board, Santa Ana Region ("Regional Board"), as required by 40 C.F.R. § 135.2(a)(1) and Section 505(b) of the CWA, 33 U.S.C. § 1365(b)(1)(A).

5.    More than sixty days have passed since the Notice Letter was sent via certified mail to Defendants and the State and Federal agencies. Plaintiff is informed and believes, and thereon alleges, that neither the EPA, USDOJ, nor the State of California have commenced or are diligently prosecuting an action to redress the violations alleged in the Notice Letter and in this complaint. *See* 33 U.S.C. § 1365(b)(1)(B). This action is not barred by any prior administrative penalty under Section 309(g) of the CWA. 33 U.S.C. § 1319(g).

6.    Venue is proper in the Central District of California pursuant to Section

505(c)(1) of the CWA, 33 U.S.C. § 1365(c)(1), because the sources of the CWA and General Permit violations are located within this judicial district.

7.    Plaintiff seeks relief for Defendants' substantive and procedural violations of the General Permit and the CWA resulting from industrial activities at the Facility.

## II.    <u>INTRODUCTION</u>

8.    This complaint seeks relief for the Defendants' unlawful discharges of pollutants into waters of the United States from industrial operations at the Facility. Specifically, Coastkeeper is informed and believes, and thereon alleges, that Defendants' discharges of pollutants from the Facility enter the Orange County Municipal Separate Storm Sewer System ("MS4"). The MS4 system empties into the Bolsa Chica Channel and from there flows into the nearby Anaheim Bay and Huntington Harbour (collectively, the "Receiving Waters"), in violation of the substantive and procedural requirements of the CWA and General Permit. These violations have been occurring since at least February 19, 2021, and are ongoing and continuous.

9.    With every significant rainfall event, large amounts of polluted storm water originating from industrial operations such as the Facility pour into storm drains and local waterways. The consensus among regulatory agencies and water quality specialists is that storm water pollution accounts for a significant amount of the total pollution entering surface waters each year. These surface waters, known as receiving waters, are ecologically sensitive areas. These waters are essential habitat for dozens of fish and bird species, as well as macro-invertebrate and invertebrate species. Storm water and non-storm water contain sediment, heavy metals such as aluminum, iron, and zinc, as well as high concentrations of nitrate and nitrite, and other pollutants. Exposure to polluted storm water harms the special aesthetic and recreational significance that the surface waters have for people in the surrounding communities. The public's use of the surface waters exposes many people to toxic metals and other contaminants in storm water and non-storm water discharges. Non-contact recreational and aesthetic opportunities, such as wildlife

observation, are also impaired by polluted discharges to surface waters such as the
Receiving Waters.

### III.   PARTIES

#### A.   Orange County Coastkeeper

10.     Orange County Coastkeeper is a nonprofit public benefit corporation
organized under the laws of the State of California and has roughly 5,601 members.
Orange County Coastkeeper's office is located at 3151 Airway Avenue, Suite F-110,
Costa Mesa, California 92626.

11.     Orange County Coastkeeper is dedicated to the protection of swimmable,
drinkable, fishable water, and the promotion of watershed resilience throughout Orange
County. To further these goals, Orange County Coastkeeper actively seeks federal and
state agency implementation of the CWA, and, where necessary, directly initiates
enforcement actions on behalf of itself and its members.

12.     Members of Orange County Coastkeeper live and own homes in the
Huntington Harbour, Anaheim Bay, and the greater Bolsa Chica Channel watershed, and
use and enjoy the waters into which the Facility discharges polluted storm water. Members
of Orange County Coastkeeper use these waterways to participate in a variety of water
sports and other activities including, fishing, swimming, boating, kayaking, bird watching,
viewing wildlife, hiking, biking, surfing, wading, standup paddle boarding, walking,
running, and engaging in scientific study, including monitoring, restoration, and research
activities. The discharge of pollutants from the Facility harms Coastkeeper's members by
negatively impacting their use and enjoyment of the receiving waters.

13.     Defendants' failure to comply with the procedural and substantive
requirements of the CWA and General Permit, including discharging polluted storm water
from the Facility, failing to report such pollution, and failing to improve the quality of
storm water discharges from the Facility in accordance with the General Permit, degrades
water quality and harms aquatic life in the Receiving Waters. Further, such actions and/or

inaction impairs Orange County Coastkeeper members' use and enjoyment of those Receiving Waters, thus giving Plaintiff standing on behalf of its members.

14. The violations of the CWA and General Permit at the Facility are ongoing and continuous. Thus, the interests of Coastkeeper's members have been, are being, and will continue to be adversely affected by Defendants' failure to comply with the CWA and General Permit. The relief sought herein will redress the harms to Plaintiff's members caused by Defendants' activities. Defendants' failure to comply with the procedural requirements of the CWA and General Permit means that Coastkeeper's members are unable to obtain statutorily required information on Defendants' storm water, and storm water management practices. Thus, Plaintiff faces both informational harm and informational injury because the CWA and General Permit provide a right to information, but Defendants have often failed to provide such information, as detailed below. Further, such informational harm and injury gives Plaintiff standing on behalf of its members.

15. The violations of the CWA and General Permit at the Facility are ongoing and continuous. Thus, the interests of Coastkeeper's members have been, are being, and will continue to be adversely affected by Defendants' failure to comply with the CWA and General Permit. The relief sought herein will redress the harms to Plaintiff's members caused by Defendants' activities.

16. Continuing commission of the acts and omissions alleged herein will irreparably harm Plaintiff's members, for which harm they have no plain, speedy, or adequate remedy at law.

**B.    The Owners and/or Operators of the Facility**

17. Thornton Steel is the current owner and operator of the Facility, and has been the owner and operator of the Facility at all times relevant to this complaint, and is a responsible party under the CWA.

18. Coastkeeper is informed and believes, and thereon alleges, that Thornton Steel is a active California corporation, registered and authorized to do business in

California.

19.    Coastkeeper is informed and believes, and thereon alleges, that Tatiana Chapman, located at 30211 Avenida De Las Banderas, Suite 200, Ranch Santa Margarita, CA 92688, is the registered agent for service of process for Thornton Steel.

20.    Coastkeeper is informed and believes, and thereon alleges, that Steve Braseny is identified as the President and Legally Responsible Person in the Facility's Storm Water Pollution Prevention Plan ("SWPPP").

21.    Coastkeeper is informed and believes, and thereon alleges, that Thornton Steel's Statement of Information to the California Secretary of State identifies Kenneth Dale Thornton as the Chief Executive Officer and Chief Financial Officer of the Facility.

22.    Coastkeeper is informed and believes, and thereon alleges, that Mr. Thornton, located at 2000 Lone Star Trail, Clarkdale, AZ 86324-3265, is the owner of the real property underlying the Facility.

23.    Property owners with knowledge and control of the activities giving rise to a CWA claim are liable for those violations over which they had knowledge and control.

24.    Coastkeeper is informed and believes, and thereon alleges, that Mr. Thornton has a lease agreement or other contractual relationship with Thornton Steel that gives Mr. Thornton knowledge and control over the acts and omissions giving rise to the violations alleged in this complaint. Further, as mentioned above, Mr. Thornton also serves as the Chief Executive Officer and Chief Financial Officer of the Facility which would additionally give him knowledge and control over the acts and omissions giving rise to the violations alleged in this complaint.

## IV.    <u>LEGAL BACKGROUND</u>

### A.    The Clean Water Act

25.    Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a), prohibits the discharge of any pollutant into waters of the United States unless the discharge complies with various enumerated sections of the CWA. Among other things, section 301(a)

prohibits discharges not authorized by, or in violation of, the terms of an NPDES permit issued pursuant to section 402 of the CWA, 33 U.S.C. §§ 1311(a) and 1342(b).

26.    Section 301(b) of the CWA requires that all point source dischargers, including those discharging polluted storm water, must achieve technology-based effluent limitations by utilizing Best Available Technology Economically Achievable ("BAT") for toxic and nonconventional pollutants and the Best Conventional Pollutant Control Technology ("BCT") for conventional pollutants. *See* 33 U.S.C. § 1311(b).

27.    The CWA requires point source discharges of pollutants to navigable waters be regulated by an NPDES permit. 33 U.S.C. § 1311(a); *see* 40 C.F.R. § 122.26(c)(1).

28.    The "discharge of a pollutant" means, among other things, "any addition of any pollutant to navigable waters from any point source." 33 U.S.C. § 1362(12); *see* 40 C.F.R. § 122.2.

29.    The term "pollutant" includes "dredged spoil, solid waste… rock, sand, cellar dirt and industrial, municipal, and agricultural waste discharged into water." 33 U.S.C. § 1362(6); *see* 40 C.F.R. § 122.2.

30.    The term "point source" means any "discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation, or vessel or other floating craft, from which pollutants are or may be discharged." 33 U.S.C. § 1362(14); *see* 40 C.F.R. § 122.2.

31.    "Waters of the United States" are defined as "navigable waters" and "waters which are currently used, or were used in the past, or may be susceptible to use in interstate or foreign commerce, including all waters which are subject to the ebb and flow of the tide." 33 U.S.C. § 1362(7); 40 C.F.R. § 120.2.

32.    The EPA promulgated regulations defining "waters of the United States." *See* 40 C.F.R. § 120.2. The EPA interprets waters of the United States to include not only traditionally navigable waters, but also other waters, including waters tributary to

navigable waters, and wetlands adjacent to navigable waters. *Id.*

33.    Section 505(a)(1) and Section 505(f) of the CWA provide for citizen enforcement actions against any "person" who is alleged to be in violation of an "effluent standard or limitation . . . or an order issued by the Administrator or a State with respect to such a standard or limitation." 33 U.S.C. §§ 1365(a)(1); *see* 1365(f).

34.    Defendants are "persons" within the meaning of Section 502(5) of the CWA. *See* 33 U.S.C. § 1362(5).

35.    An action for injunctive relief is authorized under Section 505(a) of the CWA. *See* 33 U.S.C. § 1365(a).

36.    Each separate violation of the CWA subjects the violator to a penalty of up to $66,712 per day per violation for all violations that occurred after November 2, 2015, and were assessed on or after December 27, 2023. *See* 33 U.S.C. §§ 1319(d) and 1365(a); Adjustment of Civil Monetary Penalties for Inflation, 40 C.F.R. § 19.4.

37.    Section 505(d) of the CWA, 33 U.S.C. § 1365(d), permits prevailing or substantially prevailing parties to recover litigation costs, including attorneys', experts', and consultants' fees.

**B.    The General Permit**

38.    Section 402(p) of the CWA establishes a framework for regulating industrial storm water discharges under the NPDES program. 33 U.S.C. § 1342(p).

39.    States with approved NPDES permit programs are authorized by Section 402(p) to regulate industrial storm water discharges through individual permits issued to dischargers and/or through the issuance of a single, statewide general permit applicable to all industrial storm water dischargers. 33 U.S.C § 1342.

40.    California is a state authorized by the EPA to issue NPDES permits.

41.    In California, the State Board and nine regional water boards are charged with regulating pollutants to protect California's water resources and improve water quality. *See* Cal. Water Code § 13001.

42.    The General Permit is a statewide NPDES permit issued by the State Board pursuant to the CWA.

43.    The General Permit was issued on July 1, 2015, pursuant to Order No. 2014-0057-DWQ.

44.    On November 6, 2018, the State Board amended the General Permit with Order No. 2015-0122-DWQ, incorporating: 1) the Federal Sufficiently Sensitive Test Method Ruling; 2) TMDL Implementation Requirements; and 3) Statewide Compliance Options Incentivizing On-Site or Regional Storm Water Capture and Use.

45.    In order to lawfully discharge storm water to waters of the United States in California, industrial dischargers must secure coverage under the General Permit and comply with its terms, or obtain and comply with an individual NPDES permit. *See* General Permit Finding 12.

46.    Prior to beginning industrial operations, dischargers are required to apply for coverage under the General Permit by submitting a Notice of Intent to Comply with the Terms of the General Permit to Discharge Storm Water Associated with Industrial Activity ("NOI") to the State Board. *See* General Permit, Finding 17.

47.    Violations of the General Permit are violations of the Clean Water Act. *See* General Permit, Section XXI.A (Duty to Comply).

**C.    The General Permit's Discharge Prohibitions And Technology-Based Effluent Limitations**

48.    The General Permit contains certain absolute prohibitions. The General Permit prohibits the direct or indirect discharge of materials other than storm water ("non-storm water discharges," or "NSWDs"), which are not otherwise authorized by an NPDES permit, to the waters of the United States. *See* General Permit, Discharge Prohibition III.B.

49.    The General Permit's Effluent Limitations require dischargers covered by the General Permit to reduce or prevent pollutants associated with industrial activity in storm water discharges through the implementation of Best Available Technology Economically

Achievable ("BAT") for toxic or non-conventional pollutants, and Best Conventional Pollutant Control Technology ("BCT") for conventional pollutants. Toxic pollutants are listed at 40 C.F.R. § 401.15 and include copper, iron, and zinc, among others. Conventional pollutants are listed at 40 C.F.R. § 401.16 and include biochemical oxygen demand ("BOD"), total suspended solids ("TSS"), oil and grease ("O&G"), pH, and fecal coliform. *See* General Permit, Effluent Limitation V.A.

50.    Pursuant to the CWA and the General Permit, dischargers must employ Best Management Practices ("BMPs") that constitute BAT and BCT to reduce or eliminate storm water pollution. 33 U.S.C. § 1311(b); General Permit, Effluent Limitation V.A.

51.    EPA's NPDES Storm Water Multi-Sector General Permit for Industrial Activities ("MSGP") includes numeric benchmarks for pollutant concentrations in storm water discharges ("EPA Benchmarks"), which are, in part, incorporated into the General Permit via the Table 2 Numeric Action Levels ("NALs"). *See* General Permit, Monitoring, Sampling and Analysis, XI.B.

52.    EPA Benchmarks/NALs provide an objective standard to determine whether a facility's BMPs are successfully developed and/or implemented and achieve compliance with BAT and BCT standards. General Permit, Effluent Limitation V.A.

53.    EPA Benchmarks/NALs for the following parameters are as follows: pH – 6.0 – 9.0 standard units; TSS – 100 mg/L; zinc – 0.26 mg/L; iron – 1.0 mg/L; nitrate plus nitrite as nitrogen ("N+N") – 0.68 mg/L; O&G – 15 mg/L; and aluminum – 0.75 mg/L. General Permit, Monitoring, Sampling and Analysis, Table 2.

54.    Discharges from an industrial facility containing pollutant concentrations that exceed NALs indicate that BMPs that meet BAT for toxic and non-conventional pollutants and/or BCT for conventional pollutants have not been developed and/or implemented at the Facility. General Permit, Effluent Limitation V.A.

**D.    The General Permit's Receiving Water Limitations**

55.    The CWA and the General Permit's Receiving Water Limitations prohibit

storm water discharges and unauthorized non-storm water discharges that cause or contribute to an exceedance of any applicable Water Quality Standards ("WQS"). *See* 33 U.S.C. § 1311(b)(1)(C); 40 C.F.R. §§122.4(d), 122.4(i), 122.44(d); General Permit, Receiving Water Limitation VI.A.

56.    WQS establish the water quality goals for a water body. *See* 40 C.F.R. §131.2.

57.    WQS are pollutant concentration levels determined by the State Board, the various regional boards, and the EPA to be protective of the beneficial uses of the waters that receive polluted discharges.

58.    Discharges not meeting WQS can cause or contribute to the impairment of beneficial uses of the waters that receive polluted discharges.

59.    The State of California regulates water quality through the State Board and nine regional boards. Each regional board maintains a separate water quality control plan, called a basin plan, which contains WQS for waterbodies within its geographical area.

60.    The Santa Ana Regional Board adopted the Basin Plan for the Santa Ana Region (the "Santa Ana Basin Plan" or the "Basin Plan"). The Santa Ana Basin Plan identifies the "Beneficial Uses" of water bodies within the region. The Basin Plan identifies the Beneficial Uses for Huntington Harbour to include: Navigation; Water Contact Recreation; Non-contact Water Recreation; Commercial and Sport Fishing; Wildlife Habitat; Rare, Threatened or Endangered Species; Spawning, Reproduction, and Development; and Marine Habitat. *See* Santa Ana Basin Plan at Table 3-1. The beneficial uses for Anaheim Bay, Outer Bay include: Navigation; Water Contact Recreation; Non-contact Water Recreation; Preservation of Biological Habitats of Special Significance; Wildlife Habitat; Rare, Spawning, Reproduction, and Development; and Marine Habitat. *Id*. Additionally, the beneficial uses for Anaheim Bay, Seal Beach National Wildlife Refuge include: Water Contact Recreation; Non-contact Water Recreation; Preservation of Biological Habitats of Special Significance; Wildlife Habitat; Rare, Spawning,

Reproduction, and Development; Marine Habitat; and Estuarine Habitat. *Id*. Beneficial uses for Bolsa Bay include: Water Contact Recreation; Non-contact Water Recreation; Commercial and Sport Fishing; Preservation of Biological Habitats of Special Significance; Wildlife Habitat; Rare, Spawning, Reproduction, and Development; Marine Habitat; and Shellfish Harvesting. *Id*. Lastly, beneficial uses for Bolsa Chica Ecological Reserve include: Water Contact Recreation; Non-contact Water Recreation; Preservation of Biological Habitats of Special Significance; Wildlife Habitat; Rare, Spawning, Reproduction, and Development; Marine Habitat; and Estuarine Habitat. *Id*.

61. Surface waters that cannot support the Beneficial Uses of those waters listed in the basin plans are designated as impaired water bodies pursuant to Section 303(d) of the Clean Water Act, 33 U.S.C. § 1313(d).

62. According to the 303(d) List of Impaired Water Bodies, the Bolsa Chica Channel is impaired for ammonia, pH, and indicator bacteria; Huntington Harbour is impaired for chlordane, copper, PCBs, toxicity, lead, and indicator bacteria; and, Anaheim Bay is impaired for nickel, toxicity, and PCBs. Polluted discharges from industrial sites, such as the Facility, contribute to the degradation of these already-impaired surface waters and aquatic-dependent wildlife that depend on these waters. These contaminated discharges can and must be controlled for these aquatic ecosystems to regain their health.

63. Discharges of polluted storm water to the Receiving Waters pose threats to the public, dramatically affect the use and enjoyment of the surrounding environment, and adversely affect the aquatic environment.

64. Discharges of pollutants at levels above WQS, like those from the Facility, cause or contribute to the impairment of the Beneficial Uses of the Receiving Waters.

65. WQS may be either numeric or narrative objectives. Applicable WQS include the water quality objectives in the Basin Plan, and the Criteria for Priority Toxic Pollutants in the State of California ("CTR"), 40 C.F.R. § 131.38.

66. The Basin Plan also includes narrative toxicity standards which state: "[t]oxic

substances shall not be discharged at levels that will bioaccumulate in aquatic resources to levels which are harmful to human health." Basin Plan, Water Quality Objectives. Further, "[t]he concentrations of toxic pollutants in the water column, sediments or biota shall not adversely affect beneficial uses." *Id*.

67. The CTR establishes numeric WQS to protect human health and the environment in the State of California. The numeric WQS established in the CTR for zinc is 0.12 mg/L, and copper is 0.013 mg/L, assuming a water hardness calculation of 100 mg/L. 40 C.F.R. § 131.38. The CTR numeric limits are expressed as dissolved metal concentrations.

68. Discharges with pollutant levels that cause or contribute to an exceedance of the CTR criteria, the Basin Plan standards, and/or other applicable WQS in the Receiving Waters are violations of Receiving Water Limitation Section VI.A. of the General Permit.

69. The General Permit's Receiving Water Limitations prohibit storm water discharges from adversely impacting human health or the environment. *See* General Permit, Section VI.B.

70. Storm water discharges with pollutant levels that exceed levels known to adversely impact aquatic species and the environment are violations of Receiving Water Limitation Section VI.B. of the General Permit.

**E.    The General Permit's Storm Water Pollution Prevention Plan Requirements**

71. Dischargers must develop and implement a SWPPP prior to conducting, and in order to continue, industrial activities. General Permit, Sections I.J. (Finding 68), and X.B. The SWPPP must meet all of the requirements of the General Permit. General Permit, Sections X.A-H.; *see also* General Permit, Appendix 1. The SWPPP must identify and evaluate sources of pollutants associated with industrial activities that may affect the quality of storm water and authorized non-storm water discharges from the facility. General Permit, Section X.G.

72.     The SWPPP must identify and implement site-specific BMPs to reduce or prevent pollutants associated with industrial activities in storm water and authorized non-storm water discharges. General Permit, Section X.H. The SWPPP must include BMPs that achieve pollutant discharge reductions attainable via BAT and BCT. General Permit, Section I.D. (Finding 32), Section X.C.

73.     The SWPPP must include: a narrative description and summary of all industrial activity; potential sources of pollutants, and potential pollutants; a site map indicating the storm water conveyance system, associated points of discharge, direction of flow, areas of actual and potential pollutant contact, including the extent of pollution-generating activities, nearby water bodies, and pollutant control measures; a description of storm water management practices; a description of the BMPs to be implemented to reduce or prevent pollutants in storm water discharges and authorized non-storm water discharges; the identification and elimination of non-storm water discharges; the location where significant materials are being shipped, stored, received, and handled, as well as the typical quantities of such materials and the frequency with which they are handled; a description of dust and particulate-generating activities; and an identification and description of individuals and their current responsibilities for developing and implementing the SWPPP. General Permit, Section X.

74.     The objectives of the SWPPP are to identify and evaluate sources of pollutants associated with industrial activities that may affect the quality of storm water discharges, to identify and implement site-specific BMPs to prevent the exposure of pollutants to storm water, and to reduce or prevent the discharge of polluted storm water from industrial facilities. General Permit, Section X.

75.     The General Permit requires the discharger to evaluate the SWPPP on an annual basis and revise it as necessary to ensure compliance with the General Permit. General Permit, Sections X.A-B. The General Permit also requires that the discharger conduct: an annual comprehensive site compliance evaluation that includes a review of all

visual observation records, inspection reports, sampling and analysis results; a visual inspection of all potential pollutant sources for evidence of, or the potential for, pollutants entering the drainage system; a review and evaluation of all BMPs to determine whether the BMPs are adequate, properly implemented and maintained, or whether additional BMPs are needed; and, a visual inspection of equipment needed to implement the SWPPP. General Permit, Sections X.B. and XV.

76. The SWPPP and site map(s) must be assessed annually and revised as necessary to ensure accuracy and effectiveness. General Permit, Sections I.J. (Finding 68), X.B.

## F. The General Permit's Monitoring Implementation Program Requirements

77. The General Permit requires permittees to develop and implement a storm water Monitoring Implementation Program ("MIP") and include it in the SWPPP prior to conducting, and in order to continue, industrial activities. General Permit, Sections X.I. and XI.

78. The General Permit requires facility owners and/or operators to develop and implement an adequate MIP that meets all of the requirements of the General Permit. General Permit Sections X.I. and XI.A-D.

79. The objective of the MIP is to detect and measure the concentrations of pollutants in a facility's discharge and to ensure compliance with the General Permit's Discharge Prohibitions, Effluent Limitations, and Receiving Water Limitations. *See* General Permit, Section XI.

80. An adequate MIP ensures that BMPs are effectively reducing and/or eliminating pollutants from the facility's discharges, and the MIP is evaluated and revised whenever appropriate to ensure compliance with the General Permit. *See id*.

81. The General Permit requires facility operators to monitor and sample storm water discharges to ensure that the facility is complying with the terms of the General

Permit. General Permit, Section XI.B.

82.    Section XI.A.1 of the General Permit requires dischargers to conduct monthly visual observations during dry weather of each drainage area. Monthly visual observations must include observations of any non-storm water discharges, all outdoor industrial equipment and activities, BMPs, and all potential sources of pollution. *Id*.

83.    Section XI.A.2 of the General Permit requires dischargers to conduct visual observations at the same time sampling occurs at a discharge location, and document the presence of any floating and suspended materials, oil and grease, discolorations, turbidity, odors, and the source of any pollutants in storm water discharges from the facility.

84.    Dischargers are required to maintain records of observations, observation dates, discharge locations observed, and responses taken to reduce or prevent pollutants from contacting storm water discharges. *See* General Permit, Section XI.A.3.

85.    The General Permit requires dischargers to visually observe and collect samples of storm water discharges from all locations where storm water is discharged. General Permit Section XI.B.4.

86.    Section XI.B.1 of the General Permit defines a Qualifying Storm Event ("QSE") as a precipitation event that produces a discharge for at least one drainage area and is preceded by 48 hours with no discharge from any drainage area.

87.    The General Permit requires dischargers to collect and analyze storm water samples from two QSEs within the first half of each reporting year (July 1 to December 31), and two QSEs within the second half of each reporting year (January 1 to June 30). General Permit, Section XI.B.2. Each sample must be analyzed for TSS, pH, O&G, and additional parameters identified on a facility-specific basis that serves as indicators of the presence of all industrial pollutants identified in the pollutant source assessment—in addition to those required under the Standard Industrial Classification ("SIC") code. General Permit, Section XI.B.6.

88.    Table 1 of the General Permit requires dischargers with SIC code 34XX

(Fabricated Metal Products) to analyze samples for zinc, N+N, iron, and aluminum.

89.    Section XI.B.6.c of the General Permit requires dischargers to analyze samples for pollutants associated with industrial operations.

90.    Section XI.B.6.f of the General Permit requires dischargers to analyze additional parameters required by the Regional Board.

91.    Section XI.B.6.e of the General Permit also requires dischargers to analyze storm water samples for additional applicable industrial parameters related to receiving waters with 303(d) listed impairments, or approved TMDLs.

92.    Section XI.B.11 of the General Permit, among other requirements, provides that permittees must submit all sampling and analytical results for all samples via the Storm Water Multiple Application & Report Tracking System ("SMARTS") within thirty days of obtaining all results for each sampling event.

**G.    The General Permit's Exceedance Response Actions Requirements**

93.    Under the General Permit, facility operators are required to perform Exceedance Response Actions ("ERAs") as appropriate whenever sampling indicates NAL exceedances. *See* General Permit, Section XII.

94.    An annual NAL exceedance occurs when the average of all the analytical results for a parameter from samples taken within a reporting year exceeds the annual NAL value for that parameter. General Permit, Section XII.A.1.

95.    An instantaneous maximum NAL exceedance occurs when two or more analytical results from samples taken for any single parameter within a reporting year exceed the instantaneous maximum NAL value or are outside of the instantaneous maximum NAL range for pH. General Permit, Section XII.A.

96.    Upon receiving NOI coverage, all permittees are placed in "Baseline status." General Permit, Section XII.B.

97.    A permittee's Baseline status for any given parameter changes to "Level 1 status" if sampling results indicate a NAL exceedance for that same parameter. General

Permit, Section XII.C.

98.    Level 1 status commences on July 1 following the reporting year during which the exceedance(s) occurred. General Permit, Section XII.C.

99.    By October 1 following commencement of Level 1 status, permittees are required to: complete an evaluation, with the assistance of a Qualified Industrial Stormwater Practitioner ("QISP"), of the industrial pollutant sources at the facility that are or may be related to the NAL exceedance(s); and, identify in the evaluation the corresponding BMPs in the SWPPP and any additional BMPs and SWPPP revisions necessary to prevent future NAL exceedances and to comply with the requirements of the General Permit. General Permit, Sections XII.C.1.a-c.

100.    Although the evaluation may focus on the drainage areas where the NAL exceedance(s) occurred, all drainage areas shall be evaluated. General Permit, Section XII.C.1.c.

101.    Based upon the Level 1 status evaluation, the permittee is required to, as soon as practicable but no later than January 1 following commencement of Level 1 status, revise the SWPPP as necessary and implement any additional BMPs identified in the evaluation, certify and submit via SMARTS a Level 1 ERA Report prepared by a QISP that includes a summary of the Level 1 ERA Evaluation and a detailed description of the SWPPP revisions and any additional BMPs for each parameter that exceeded a NAL. General Permit, Sections XII.C.2.a.i-ii.

102.    The permittee in Level 1 status must also certify and submit via SMARTS the QISP's identification number, name, and contact information (telephone number, e-mail address) no later than January 1 following commencement of Level 1 status. General Permit, Section XII.C.2.a.iii.

103.    A permittee's Level 1 status for a parameter will return to Baseline status once a Level 1 ERA Report has been completed, all identified additional BMPs have been implemented, and results from four consecutive QSEs that were sampled subsequent to

BMP implementation indicate no additional NAL exceedances for that parameter. General Permit, Section XII.C.2.b.

104.    A permittee's Level 1 status for any given parameter shall change to Level 2 status if sampling results indicate a NAL exceedance for that same parameter while the discharger is in Level 1. General Permit, Section XII.D.

105.    Level 2 status commences on July 1 following the reporting year during which the NAL exceedance(s) occurred. General Permit, Section XII.D.

106.    A discharger in Level 2 status shall submit a Level 2 ERA Action Plan prepared by a QISP that addresses each new Level 2 NAL exceedance by January 1 following the reporting year during which the NAL exceedances occurred. General Permit, Section XII.D.1.a.

107.    On January 1 of the reporting year following the submittal of the Level 2 ERA Action Plan, a discharger shall certify and submit a Level 2 ERA Technical Report prepared by a QISP to SMARTS that includes one or more of the following demonstrations: (a) Industrial Activity BMPs Demonstration; (b) Non-Industrial Pollutant Source Demonstration; and/or, (c) Natural Background Pollutant Source Demonstration. General Permit, Section XII.D.2.

108.    Dischargers with Level 2 status are required to annually update their Level 2 ERA Technical Reports based upon additional NAL exceedances of the same parameter and same drainage area, facility operational changes, pollutant source(s) changes, and/or information that becomes available via compliance activities. General Permit, Section XII.D.3.c.

109.    Dischargers with Level 2 status who submit one of the above demonstrations and have implemented BMPs to prevent future NAL exceedance(s) for the Level 2 parameter(s) shall return to baseline status for that parameter, if results from four subsequent consecutive QSEs sampled indicate no additional NAL exceedance(s) for that parameter(s). General Permit, Section XII.D.4.a.

110.   If future NAL exceedances occur for the same parameter(s), the Dischargers' Baseline status will return to Level 2 status on July 1 in the subsequent reporting year during which the NAL exceedance(s) occurred. *Id*.

### H.   The General Permit's Annual Reporting Requirements

111.   Section XVI of the General Permit requires dischargers to submit an Annual Report to the Regional Board by July 15 of each year.

112.   The Annual Report must include a Compliance Checklist that indicates whether a discharger has complied with all of the applicable requirements of the General Permit, an explanation for any non-compliance of requirements within the reporting year, an identification, including page numbers and/or sections, of all revisions made to the SWPPP within the reporting year, and the date(s) of the Annual Evaluation. General Permit, Section XVI.

## V.   FACTUAL BACKGROUND

### A.   The Facility's General Permit Coverage

113.   Plaintiff is informed and believes, and thereon alleges, that on or about February 19, 2021, Thornton Steel obtained General Permit coverage for the Facility by submitting an NOI to the State Board.

114.   Plaintiff is informed and believes, and thereon alleges, that the Facility's NOI identifies the operator of the facility located at 1323 South State College Parkway, Anaheim, CA, 92806 (the "Thornton Steel NOI") as Thornton Steel & Iron Works, Inc.

115.   Plaintiff is informed and believes, and thereon alleges, that the Thornton Steel NOI lists the Facility size as 27,740 square feet with 11,000 square feet of industrial area exposed to storm water.

116.   Plaintiff is informed and believes, and thereon alleges, that the Waste Discharger Identification ("WDID") number listed on the Thornton Steel NOI is 8 30I029099.

117.   Plaintiff is informed and believes, and thereon alleges, that the Thornton

Steel NOI indicates that 95% of the Facility is impervious.

118.    Plaintiff is informed and believes, and thereon alleges, that the Facility's operating hours, per the Facility SWPPP, are Monday through Friday from 7:00AM to 4:30PM.

119.    Plaintiff is informed and believes, and thereon alleges, that the Facility's NOI lists Bolsa Chica Channel and Huntington Harbour as the Facility's receiving waters.

120.    SMARTS lists the Facility's coverage under the General Permit as "Active."

121.    The Thornton Steel NOI lists the SIC code for the Facility as 3446 (Architectural and Ornamental Metal Work).

122.    Plaintiff is informed and believes, and thereon alleges, that the Facility is required to sample for pH, O&G, TSS, zinc, N+N, iron, and aluminum, based on General Permit and SIC code requirements. General Permit, Section XI.B.6.

123.    Further, since the Facility SWPPP indicates that forklifts are used at the Facility, and since forklifts shed copper, copper is a pollutant associated with industrial activities at the Facility, for which the Facility should be testing for in its storm water.

**B.    Industrial Activities and Pollutant Sources at the Facility**

124.    Plaintiff is informed and believes, and thereon alleges, that the Facility's primary industrial purpose is metal fabrication.

125.    Plaintiff is informed and believes, and thereon alleges, that the primary industrial processes at the Facility include welding and fabrication, cutting and grinding, and spray painting and priming.

126.    Plaintiff is informed and believes, and thereon alleges, that areas of industrial activity at the Facility include paint booth(s), wet saws and grinding stations, forming and fabricating stations, vehicle storage areas, material storage, and other finished product storage.

127.    Plaintiff is informed and believes, and thereon alleges, that the Facility ancillary operations include machine maintenance, housekeeping, sales, administrative

activities, vehicle maintenance and storage, and other industrial activities relating to delivery such as trucking and use of forklifts.

128.  Plaintiff is informed and believes, and thereon alleges, that industrial materials and equipment are stored outside without adequate cover or containment.

129.  Plaintiff is informed and believes, and thereon alleges, that Defendants have not properly developed and/or implemented the required BMPs to address the pollutant sources and associated pollutants at the Facility.

130.  BMPs are necessary at the Facility to prevent the exposure of pollutants to precipitation and the subsequent discharge of polluted storm water and/or unauthorized non-storm water from the Facility during rain events.

131.  Plaintiff is informed and believes, and thereon alleges, that due to the issues listed in Paragraphs 127-129 above,  discharges of polluted storm water and unauthorized non-storm water are caused when materials are leaked, tracked, spilled, carried by the wind, or carried by other non-storm water discharges from the Facility, into the street, storm drain, and, ultimately, into the Receiving Waters.

132.  Plaintiff is informed and believes, and thereon alleges, that pollutants have been and continue to be tracked throughout the Facility by vehicles and machinery, which is tracked to areas of exposure and then outside of the Facility.

133.  Plaintiff is informed and believes, and thereon alleges, that pollutants that are tracked outside the Facility enter the street, storm drain, and then are carried to the Receiving Waters by non-storm water discharges, such as high pressure or power washing activities or other means.

134.  Plaintiff is informed and believes, and thereon alleges, that the areas of industrial activity at the Facility are sources of pollutants.

135.  Plaintiff is informed and believes, and thereon alleges, that illegal discharges of polluted storm water and non-storm water negatively impact Plaintiff's members' use and enjoyment of the Receiving Waters by degrading the quality of the Receiving Waters

1    and by posing risks to human health and aquatic life.

2    **C.    The Facility's Storm Water Flow, Sampling Points, and Discharges to**

3    **the Receiving Waters**

4    136.    Plaintiff is informed and believes, and thereon alleges, that the Facility

5    contains roof drainage and sheet flow runoff that takes place in paved areas and driveways

6    on site.

7    137.    Plaintiff is informed and believes, and thereon alleges, that the Facility's

8    discharges drain to South State College Parkway along concrete swales and driveways,

9    which discharge into the concrete gutter of the street, flow down South State College

10   Parkway, and ultimately enter the MS4 system and flow to the Receiving Waters.

11   138.    Plaintiff is informed and believes, and thereon alleges, that the Facility has

12   at least one discharge location and one storm water sampling location.

13   139.    Plaintiff is informed and believes, and thereon alleges, that Bolsa Chica

14   Channel is tributary to Anaheim Bay and Huntington Harbour with a relatively permanent

15   surface connection thereto, and that Anaheim Bay and Huntington Harbour are navigable-

16   in-fact and subject to the ebb and flow of the tide, and thus are navigable waters of the

17   United States.

18   **VI.    DEFENDANTS' VIOLATIONS OF THE GENERAL PERMIT AND CWA**

19   **A.    Defendants' Violations of the General Permit's Technology-Based**

20   **Effluent Limitations**

21   140.    Plaintiff is informed and believes, and thereon alleges, that BMPs that

22   achieve BAT/BCT have not been implemented at the Facility.

23   141.    Plaintiff is informed and believes, and thereon alleges, that storm water

24   discharges from the Facility contain concentrations of pollutants associated with the

25   Facility's industrial activities above benchmark levels established by the EPA and

26   incorporated into the General Permit.

27   142.    Plaintiff is informed and believes, and thereon alleges, that storm water

28

discharges from the Facility contain concentrations of pollutants with exceedances of NALs for aluminum, iron, zinc, and N+N.

143. Plaintiff is informed and believes, and thereon alleges, that for the 2022-2023 reporting year, the Facility exceeded NALs for aluminum, iron, zinc, and N+N.

144. Plaintiff is informed and believes, and thereon alleges, that had the Facility conducted additional sampling as required by the General Permit and CWA, the Facility would have shown additional NAL exceedances.

145. During the 2021-2022 reporting year, Plaintiff sampled the Facility's storm water discharge on March 28, 2022. The storm water sampling data showed NAL exceedances for O&G, iron, zinc, and N+N.

146. During the 2022-2023 reporting year, Coastkeeper sampled the Facility's storm water discharge on December 11, 2022, December 27, 2022, and February 24, 2023. Such storm water sampling data showed NAL exceedances for iron, zinc, and N+N.

147. Plaintiff is informed and believes, and thereon alleges, that the ongoing exceedances of NALs demonstrate that Defendants have failed and continue to fail to develop and/or implement BMPs at the Facility as required to achieve compliance with the BAT/BCT standards in order to prevent the exposure of pollutants to storm water and to prevent discharges of polluted storm water from the Facility.

148. Plaintiff is informed and believes, and thereon alleges, that the technology based effluent limitations of the General Permit are violated each day that BMPs achieving these technology-based effluent limitations are not in place at the Facility.

149. Each day that Defendants have failed to develop and implement BAT and BCT at the Facility in violation of the General Permit is a separate and distinct violation of the CWA.

150. Defendants have been in violation of the BAT and BCT requirements at the Facility every day since at least February 19, 2021.

151. Defendants are liable for daily violations of the General Permit's technology

based effluent limitations, every day since at least February 19, 2021.

**B.    Defendants' Violations of the General Permit's Receiving Water Limitations**

152.    Plaintiff is informed and believes, and thereon alleges, that the Facility's discharges include concentrations of metals and other pollutants that cause or contribute to exceedances of WQS in the Receiving Waters, including those WQS laid out in the CTR and Santa Ana Basin Plan.

153.    Plaintiff is informed and believes, and thereon alleges, that each time polluted storm water discharges from the Facility in excess of an applicable CTR value, Defendants violate Receiving Water Limitation VI.A of the General Permit and Section 301(a) of the CWA, 33 U.S.C. § 1311(a), to not cause or contribute to an exceedance of any applicable WQS in the Receiving Waters.

154.    Plaintiff is informed and believes, and thereon alleges, that storm water samples collected by both the Facility and Plaintiff demonstrate that discharges from the Facility contain elevated concentrations of zinc, as well as copper, a pollutant that Plaintiff alleges the Facility should be testing for since it is a pollutant associated with the Facility's industrial activities, that cause or contribute to a violation of an applicable WQS in the CTR.

155.    Plaintiff is informed and believes, and thereon alleges, that the Facility further violates the Receiving Water Limitation by causing or contributing to an exceedance of an additional WQS. *See* CWA 303(d) list, 33 U.S.C. § 1313(d). For example, Huntington Harbour is impaired for copper under the CWA 303(d) list, and the Facility causes or contributes to an exceedance of this WQS by contributing to increased levels of copper in Huntington Harbour.

156.    Plaintiff is informed and believes, and thereon alleges, that the Facility's discharge violations are ongoing and will continue every time contaminated storm water is discharged from the Facility in violation of the General Permit.

157.   Each time discharges of storm water from the Facility cause or contribute to a violation of an applicable WQS is a separate and distinct violation of Receiving Water Limitation VI.A of the General Permit and Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

158.   Each time discharges from the Facility adversely impact human health or the environment is a separate and distinct violation of Receiving Water Limitation VI.B of the General Permit and Section 301(a) of the CWA, 33 U.S.C. §1311(a).

**C.   Defendants' Non-Storm Water Discharges in Violation of the General Permit and the CWA**

159.   Plaintiff is informed and believes, and thereon alleges, that unauthorized non-storm water discharges occur at the Facility due to inadequate BMP development and/or implementation necessary to prevent such discharges.

160.   Plaintiff is informed and believes, and thereon alleges, that unauthorized non-storm water discharges are ongoing and will continue until Defendants develop and implement BMPs that will prevent prohibited non-stormwater discharges, or obtain separate NPDES permit coverage.

161.   Plaintiff is informed and believes, and thereon alleges, that unauthorized non-storm water discharges occur as a result of industrial materials and equipment being stored outside without adequate cover or containment, and/or cleaning activities being conducted without adequate BMPs.

162.   Non-storm water discharges resulting from the activities described above are not from sources that are listed among the authorized non-storm water discharges in Special Conditions and are always prohibited under the General Permit. General Permit, Section IV.A.

**D.   Defendants' Violations of the General Permit's SWPPP Requirements**

163.   The Facility's original SWPPP is publicly available via the SMARTS

database and is from February 9, 2021.

164.   Plaintiff is informed and believes, and thereon alleges, that Defendants have failed and continue to fail to adequately develop, implement, and/or revise a SWPPP, in violation of SWPPP requirements of the General Permit.

165.   Plaintiff is informed and believes, and thereon alleges, that the SWPPP failed to describe: (i) the locations where each industrial material is stored, received, shipped, and handled with specificity, and (ii) the typical quantities and handling frequency of each industrial material as required by the General Permit.

166.   Plaintiff is informed and believes, and thereon alleges, that the SWPPP also fails to describe the responsibilities, duties, and activities of each SWPPP team member in accordance with the Permit.

167.   Plaintiff is informed and believes, and thereon alleges, that the SWPPP does not adequately describe, at a minimum, the Facility's: (i) industrial processes, listing only general information such as welding and fabrication, (ii) dust and particulate generating activities – the SWPPP states that all dust and particulate generating areas are on the site map, but the Permit requires a description of all industrial activities that generate a significant amount of dust or particulates, controlled or not, to be *described* and included in the site map, (iii) areas where spills and leaks can occur, (iv) evaluation of NSWDs, and (v) BMP descriptions, all in violation of the Permit.

168.   Plaintiff is informed and believes, and thereon alleges, that the Facility's Site Map fails to depict: (i) drainage areas, (ii) storm water collection and conveyance systems, (iii) structural control measures, (iv) impervious areas, (v) municipal storm drain inlets, (vi) locations where materials are directly exposed to precipitation, (vii) locations where identified significant spills or leaks have occurred, and (viii) other areas and items as required by the Permit.

169.   Plaintiff is informed and believes, and thereon alleges, that Defendants have failed to adequately revise the SWPPP in response to ongoing high concentrations of

pollutants.

170.    Each day the Facility has operated with an inadequately developed, implemented, and/or improperly revised SWPPP is a separate and distinct violation of the General Permit and the CWA.

171.    Plaintiff is informed and believes, and thereon alleges, that Defendants have been in daily and continuous violation of the General Permit's SWPPP requirements since at least February 9, 2021.

**E.    Defendants' Violations of the General Permit's Monitoring Implementation Plan Requirements**

172.    Plaintiff is informed and believes, and thereon alleges, that Defendants have been conducting, and continue to conduct, operations at the Facility with an inadequately developed, implemented, and/or improperly revised MIP, in violation of the MIP requirements of the General Permit.

173.    Plaintiff is informed and believes, and thereon alleges, that Defendants have failed and continue to fail to collect storm water discharge samples as required pursuant to Section XI.B.2 of the General Permit, which requires dischargers to collect and analyze storm water samples from two QSEs within the first half of each reporting year and two QSEs within the second half of each reporting year.

174.    Plaintiff is informed and believes, and thereon alleges, that the Facility failed to collect storm water samples during the 2020-2021, 2021-2022, and 2023-2024 reporting years.

175.    Plaintiff is informed and believes, and thereon alleges, that Defendants collected just two samples during the 2022-2023 reporting year.

176.    Plaintiff is informed and believes, and thereon alleges, that in the 2020-2021, 2021-2022, and 2022-2023 reporting years, Defendants claimed that rain events did not produce enough discharge during business hours to allow for storm water sampling.

177.    Plaintiff is informed and believes, and thereon alleges, that in the 2023-2024

reporting year, Defendants claim that, "It did not rain during my work hours, so a sample could not be taken." Defendants' 2023-2024 Annual Report. This is not a valid excuse considering that the General Permit requires that additional staff be available to cover SWPPP responsibilities if the primary person is not available to handle those responsibilities. General Permit, Section X.D.1.c.

178.   Plaintiff is informed and believes, and thereon alleges, that the Facility has not collected the required number of water samples during QSEs in any reporting year within the relevant period.

179.   Plaintiff is informed and believes, and thereon alleges, that the Facility's reporting erroneously indicates that Defendants were unable to collect the required samples because there were not sufficient enough rain events.

180.   Climatological data obtained from the National Oceanic and Atmospheric Administration ("NOAA") demonstrates that there were additional opportunities to sample significant rain events during each reporting year. *See* Ex. 2 of Notice Letter attached hereto as Ex. A.

181.   Further, Coastkeeper staff observed, documented, and collected samples of discharges from the Facility on several occasions during which the Facility failed to sample – March 28, 2022, December 11, 2022, December 27, 2022, and February 24, 2023. *See* Ex. 1 of Notice Letter attached hereto as Ex. A.

182.   Defendants' failure to conduct sampling and monitoring as required by the General Permit demonstrates that it has failed to develop, implement, and/or revise a MIP that complies with the requirements of Section XI of the General Permit.

183.   Plaintiff is informed and believes, and thereon alleges, that based upon the failure to collect the required number of samples, Defendants have failed and continue to fail to conduct and record adequate visual observations of storm water discharges since at least February 19, 2021, in violation of General Permit, Section XI.A.2.

184.   Plaintiff is informed and believes, and thereon alleges, that Defendants have

failed and continue to fail to conduct and record all required monthly dry weather visual observations at the Facility.

185.   Plaintiff is informed and believes, and thereon alleges, that Defendants have been in ongoing and continuous violation of the General Permit's MIP requirements since at least February 19, 2021.

186.   Plaintiff is informed and believes, and thereon alleges, that Defendants are in violation of the General Permit and the CWA because they have failed and continue to fail to adequately develop, implement, and/or revise their MIP in violation of the General Permit's MIP requirements.

F.   **Defendants' Violations of the General Permit's Exceedance Response Requirements**

187.   Plaintiff is informed and believes, and thereon alleges, that based on storm water sample results submitted by Defendants, the Facility has been in Level 1 status for aluminum, iron, zinc, and N+N, from at least the 2022-2023 reporting year through the 2023-2024 reporting year.

188.   Plaintiff is informed and believes, and thereon alleges, that Defendants were required to: (i) complete a Level 1 ERA Evaluation by October 1, 2023, (ii) prepare and submit a Level 1 ERA Report to SMARTS by January 1, 2024, and (iii) amend the SWPPP accordingly with revisions uploaded to SMARTS by January 1, 2024.

189.   Plaintiff is informed and believes, and thereon alleges, that Defendants untimely uploaded the Level 1 Report to SMARTs on April 15, 2024, and have not amended the SWPPP since its original issuance on February 9, 2021.

190.   Plaintiff is informed and believes, and thereon alleges, that Defendants' ERA Report failed to sufficiently evaluate the Facility's pollution issues and suggested only minor and vague housekeeping changes.

191.   Plaintiff is informed and believes, and thereon alleges, that due to Defendants' failure to sample during the 2023-2024 reporting year, the Facility remained

in Level 1 ERA status for aluminum, iron, zinc, and N+N at the end of the 2023-2024 reporting year.

192.    Plaintiff is informed and believes, and thereon alleges, that the Facility failed to update its Level 1 ERA Report, and again failed to amend the SWPPP accordingly with revisions per General Permit requirements.

193.    Sampling data obtained by Plaintiff indicate continued, high exceedances of O&G, iron, zinc, N+N, and copper, indicating a failure to comply with the General Permit's requirements to utilize an iterative process for determining and improving BMPs.

194.    Plaintiff is informed and believes, and thereon alleges, that Defendants have failed and continue to fail to take Exceedance Response Actions as required by General Permit Section XII.

195.    Plaintiff is informed and believes, and thereon alleges, that Defendants have been in daily and continuous violation of the General Permit's Exceedance Response Actions requirements since at least January 1, 2023.

196.    Plaintiff is informed and believes, and thereon alleges, that every day the Facility operates without timely submitting and implementing all required ERA documentation is a separate and distinct violation of the General Permit and the CWA, for which Defendants are liable.

### G.    Defendants' Failure To Comply With The General Permit's Reporting Requirements

197.    Plaintiff is informed and believes, and thereon alleges, that Defendants have failed and continue to fail to submit Annual Reports that comply with the General Permit's reporting requirements.

198.    Plaintiff is informed and believes, and thereon alleges, that each of Defendants' Annual Reports falsely attribute lack of sampling to lack of rain.

199.    Plaintiff is informed and believes, and thereon alleges, that based on climatological data obtained from NOAA, there were additional opportunities to sample

significant rain events during each of the reporting years. *See* Ex. 2 of Notice Letter attached hereto as Ex. A.

200.   Plaintiff is informed and believes, and thereon alleges, that Coastkeeper conducted storm water sampling on additional dates where Defendants stated there was insufficient storm water discharge to conduct sampling.

201.   Plaintiff is informed and believes, and thereon alleges, that the Facility erroneously certified that all of the information submitted in the Annual Reports was true and correct despite the factual deficiencies detailed in paragraphs 198-200.

202.   Plaintiff is informed and believes, and thereon alleges, that Defendants have submitted inaccurate Annual Reports which fail to comply with the General Permit, and as a result, Defendants are in daily violation of the General Permit.

203.   Plaintiff is informed and believes, and thereon alleges, that Defendants have been in daily and continuous violation of the General Permit's annual reporting requirements every day since at least June 21, 2021.

204.   Every day Defendants conduct operations at the Facility without reporting as required by the General Permit is a separate and distinct violation of the General Permit and Section 301(a) of the CWA, 33 U.S.C. §1311(a).

## VII.   CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION
**Violation of Section 301(a) of the Clean Water Act by Discharging Contaminated Storm Water in Violation of the General Permit's Technology Based Effluent Limitations**

### 33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)

205.   Plaintiff incorporates the allegations contained in the above paragraphs as though fully set forth herein.

206.   Plaintiff is informed and believes, and thereon alleges, that Defendants failed and continue to fail to reduce or prevent pollutants associated with industrial activities in its storm water discharges because the Facility has not implemented BMPs that achieve

BAT/BCT.

207.   Defendants' failure to develop and/or implement BMPs that achieve the pollutant discharge reductions attainable via BAT or BCT at the Facility is a daily and continuous violation of the General Permit and the CWA. General Permit, Section I.D (Finding 32), Effluent Limitation V.A; 33 U.S.C. § 1311(b).

208.   Defendants violated, violate, and will continue to violate the General Permit's Technology Based Effluent Limitations each day that the Facility is not implementing BMPs that achieve BAT/BCT standards for discharges of pollutants to waters of the United States from the Facility.

209.   Plaintiff is informed and believes, and thereon alleges, that Mr. Thornton has a lease agreement or other contractual relationship with Thornton Steel that gives Mr. Thornton knowledge and control over the acts and omissions giving rise to the violations alleged in this complaint. Further, as mentioned above, Mr. Thornton also serves as the Chief Executive Officer and Chief Financial Officer of the Facility which would additionally give him knowledge and control over the acts and omissions giving rise to the violations alleged in this complaint.

210.   Plaintiff is informed and believes, and thereon alleges, that Defendants violated the Effluent Limitations of the General Permit and the Clean Water Act within the applicable statute of limitations, and such violations are ongoing and continuous.

211.   Plaintiff is informed and believes, and thereon alleges, that Defendants' acts and omissions described herein constitute violations of individual terms of the General Permit, compliance with which is required to lawfully discharge pollutants to waters of the United States.

212.   Plaintiff alleges that its members have been harmed by Defendants' acts and omissions described herein and have standing to bring this suit.

213.   Each and every violation of the General Permit's Effluent Limitations is a separate and distinct violation of Section 301(a) of the CWA, 33 U.S.C. § 1311(a).

214.  By committing the acts and omissions alleged above, Defendants are subject to an assessment of civil penalties for each and every violation of the CWA occurring from February 19, 2021, to the present, pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

215.  An action for injunctive relief is authorized by CWA Section 505(a), 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiff and the citizens of the State of California, for which harm Plaintiff and citizens have no plain, speedy, or adequate remedy at law.

216.  An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

## SECOND CAUSE OF ACTION
**Defendants' Discharges of Contaminated Storm Water in Violation of the General Permit's Receiving Water Limitations and the Clean Water Act**
### 33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)

217.  Plaintiff incorporates the allegations contained in the above paragraphs as though fully set forth herein.

218.  Plaintiff is informed and believes, and thereon alleges that, within the applicable statute of limitations, discharges of storm water containing levels of pollutants that adversely impact human health and/or the environment occur each time storm water discharges from the Facility.

219.  Plaintiff is informed and believes, and thereon alleges that, within the applicable statute of limitations, storm water containing levels of pollutants that cause or contribute to exceedances of water quality standards, such as the CTR and the WQS described in the Santa Ana Basin Plan, have, and continue to be, discharged each time storm water discharges from the Facility.

220.  Plaintiff is informed and believes, and thereon alleges, that Defendants' acts and omissions described herein constitute violations of individual terms of the General Permit, compliance with which is required to lawfully discharge pollutants to waters of

1    the United States.

2       221.   Plaintiff alleges that its members have been harmed by Defendants' acts and

3    omissions described herein and have standing to bring this suit.

4       222.   Defendants violated, violate, and will continue to violate the General

5    Permit's Receiving Water Limitations each and every time storm water containing levels

6    of pollutants that adversely impact human health and/or the environment, and that causes

7    or contributes to exceedances of WQS, discharges from the Facility.

8       223.   Plaintiff is informed and believes, and thereon alleges, that Defendants have

9    violated, violate, and continue to violate, the Receiving Water Limitations of the General

10   Permit and the CWA within the applicable statute of limitations, and that such violations

11   are ongoing and continuous.

12      224.   Each and every violation, within the applicable statute of limitations, of the

13   General Permit Receiving Water Limitations is a separate and distinct violation of Section

14   301(a) of the CWA, 33 U.S.C. § 1311(a).

15      225.   By committing the acts and omissions alleged above, Defendants are subject

16   to an assessment of civil penalties for each and every violation of the CWA occurring

17   from February 19, 2021, to the present, pursuant to Sections 309(d) and 505 of the CWA,

18   33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

19      226.   An action for injunctive relief under the Clean Water Act is authorized by

20   Section 505(a), 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions

21   alleged above would irreparably harm Plaintiff and the citizens of the State of California,

22   for which harm Plaintiff and citizens have no plain, speedy, or adequate remedy at law.

23      227.   An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because

24   an actual controversy exists as to the rights and other legal relations of the Parties.

25

26

27

28

## THIRD CAUSE OF ACTION

### Defendants' Discharges of Non-Storm Water in Violation of the General Permit and the CWA

### U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)

228.    Plaintiff incorporates the allegations contained in the above paragraphs as though fully set forth herein.

229.    Plaintiff is informed and believes, and thereon alleges that, within the applicable statute of limitations, prohibited non-storm water discharges have discharged and continue to discharge from the Facility, in violation of the General Permit and CWA Section 301(a). 33 U.S.C. § 1311(a).

230.    Plaintiff is informed and believes, and thereon alleges, that Defendants violated the Discharge Prohibitions of the General Permit, within the applicable statute of limitations, and such violations are ongoing and continuous.

231.    Plaintiff is informed and believes, and thereon alleges, that Mr. Thornton has a lease agreement or other contractual relationship with Thornton Steel that gives Mr. Thornton knowledge and control over the acts and omissions giving rise to the violations alleged in this complaint. Further, as mentioned above, Mr. Thornton also serves as the Chief Executive Officer and Chief Financial Officer of the Facility which would additionally give him knowledge and control over the acts and omissions giving rise to the violations alleged in this complaint.

232.    Each and every violation within the applicable statute of limitations of the General Permit's Discharge Prohibitions is a separate and distinct violation of Section 301(a) of the CWA. 33 U.S.C. § 1311(a).

233.    By committing the acts and omissions alleged above, Defendants are subject to an assessment of civil penalties for each and every violation of the CWA occurring from February 19, 2021, to the present, pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

234.    An action for injunctive relief under the CWA is authorized by Section 505(a) of the CWA. 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiff and the citizens of the State of California, for which harm Plaintiff and citizens have no plain, speedy, or adequate remedy at law.

235.    An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

### FOURTH CAUSE OF ACTION

**Defendants' Failure to Adequately Develop, Implement, and/or Revise a Storm Water Pollution Prevention Plan in Violation of the General Permit and the Clean Water Act**

### 33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)

236.    Plaintiff incorporates the allegations contained in the above paragraphs as though fully set forth herein.

237.    Plaintiff is informed and believes, and thereon alleges, within the applicable statute of limitations, that Defendants have failed and continue to fail to develop an adequate SWPPP for the Facility, in violation of the General Permit.

238.    Plaintiff is informed and believes, and thereon alleges, within the applicable statute of limitations, that Defendants have failed and continue to fail to adequately implement the SWPPP for the Facility, in violation of the General Permit.

239.    Plaintiff is informed and believes, and thereon alleges, within the applicable statute of limitations, that Defendants have failed and continue to fail to adequately revise the SWPPP for the Facility, in violation of the General Permit.

240.    Defendants have been in violation of the General Permit at the Facility every day from February 9, 2021, to the present.

241.    Defendants' violations of the General Permit and the CWA at the Facility are ongoing and continuous.

242.    Defendants will continue to be in violation of the General Permit and the CWA each and every day Defendants fail to adequately develop, implement, and/or revise

the SWPPP for the Facility.

243.   Plaintiff is informed and believes, and thereon alleges, that Defendants' acts and omissions described herein constitute violations of individual terms of the General Permit, compliance with which is required to lawfully discharge pollutants to waters of the United States.

244.   Plaintiff alleges that its members have been harmed by Defendants' acts and omissions described herein and have standing to bring this suit.

245.   Each and every violation of the General Permit SWPPP requirements at the Facility is a separate and distinct violation of the CWA.

246.   By committing the acts and omissions alleged above, Defendants are subject to an assessment of civil penalties for each and every violation of the CWA occurring from February 9, 2021, to the present, pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

247.   An action for injunctive relief under the CWA is authorized by Section 505(a) of the CWA. 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiff and the citizens of the State of California, for which harm Plaintiff and citizens have no plain, speedy, or adequate remedy at law.

248.   An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

## FIFTH CAUSE OF ACTION

**Defendants' Failure to Adequately Develop, Implement, and/or Revise a Monitoring Implementation Plan in Violation of the General Permit and the Clean Water Act**

### 33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)

249.   Plaintiff incorporates the allegations contained in the above paragraphs as though fully set forth herein.

250.   Plaintiff is informed and believes, and thereon alleges, that Defendants have failed and continue to fail to collect storm water discharge samples as required by the

General Permit. During the statute of limitations, Defendants were required to sample their storm water during 14 QSEs, but in actuality, Defendants only sampled during two QSEs.

251.   Plaintiff is informed and believes, and thereon alleges, that Defendants have failed and continue to fail to conduct and record adequate visual observations of storm water discharges during those same QSEs.

252.   Plaintiff is informed and believes, and thereon alleges, that Defendants have failed and continue to fail to conduct and record all required monthly dry weather visual observations at the Facility.

253.   Plaintiff is informed and believes, and thereon alleges, within the applicable statute of limitations, that Defendants have failed and continue to fail to develop an adequate MIP for the Facility, in violation of the General Permit.

254.   Plaintiff is informed and believes, and thereon alleges, within the applicable statute of limitations, that Defendants have failed and continue to fail to adequately implement the MIP for the Facility, in violation of the General Permit.

255.   Plaintiff is informed and believes, and thereon alleges that, within the applicable statute of limitations, Defendants have failed and continue to fail to adequately revise the MIP for the Facility, in violation of the General Permit.

256.   Defendants have been in violation of the General Permit monitoring requirements at the Facility every day from February 19, 2021, to the present.

257.   Defendants' violations of the General Permit monitoring requirements and the CWA at the Facility are ongoing and continuous.

258.   Defendants will continue to be in violation of Section XI of the General Permit and the CWA each and every day they fail to adequately develop, implement, and/or revise the MIP for the Facility.

259.   Plaintiff is informed and believes, and thereon alleges, that Defendants' acts and omissions described herein constitute violations of individual terms of the General Permit, compliance with which is required to lawfully discharge pollutants to waters of

the United States.

260. Plaintiff alleges that its members have been harmed by Defendants' acts and omissions described herein and have standing to bring this suit.

261. Each and every violation of the General Permit MIP requirements at the Facility is a separate and distinct violation of the CWA.

262. By committing the acts and omissions alleged above, the Defendants are subject to an assessment of civil penalties for each and every violation of the CWA occurring from February 19, 2021, to the present, pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

263. An action for injunctive relief under the CWA is authorized by Section 505(a) of the CWA. 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiff and the citizens of the State of California, for which harm Plaintiff and citizens have no plain, speedy, or adequate remedy at law.

264. An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

### SIXTH CAUSE OF ACTION
**Defendants' Failure to Satisfy Exceedance Response Requirements in Violation of the General Permit and the Clean Water Act**
**33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)**

265. Plaintiff incorporates the allegations contained in the above paragraphs as though fully set forth herein.

266. Plaintiff is informed and believes, and thereon alleges, that Defendants have failed and continue to fail to take Exceedance Response Actions as required by General Permit Section XII.

267. Plaintiff is informed and believes, and thereon alleges, that Defendants have failed to submit required ERA documentation during the applicable statute of limitations.

268. Plaintiff is informed and believes, and thereon alleges, that even when Defendants did submit certain required ERA documentation during the applicable statute

of limitations, such documentation failed to comply with requirements set out within the General Permit and CWA.

269. Plaintiff is informed and believes, and thereon alleges, that Defendants have been in daily and continuous violation of the General Permit's Exceedance Response Actions requirements since at least January 1, 2023.

270. By committing the acts and omissions alleged above, the Defendants are subject to an assessment of civil penalties for each and every violation of the CWA occurring from January 1, 2023, to the present, pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

271. An action for injunctive relief under the CWA is authorized by Section 505(a) of the CWA. 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiff and the citizens of the State of California, for which harm Plaintiff and citizens have no plain, speedy, or adequate remedy at law.

272. An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

## SEVENTH CAUSE OF ACTION
### Defendants' Failure to Report as Required by the General Permit in Violation of the General Permit and the Clean Water Act
### 33 U.S.C. §§ 1311(a), 1342, 1365(a) and 1365(f)

273. Plaintiff incorporates the allegations contained in the above paragraphs as though fully set forth herein.

274. Plaintiff is informed and believes, and thereon alleges that, within the applicable statute of limitations, Defendants' Annual Reports failed to meet the requirements of Section XVI.B of the General Permit.

275. Plaintiff is informed and believes, and thereon alleges that, within the applicable statute of limitations, Defendants' Annual Reports erroneously certified compliance with the General Permit.

276. Plaintiff is informed and believes, and thereon alleges, that Defendants' acts

and omissions described herein constitute violations of individual terms of the General Permit, compliance with which is required to lawfully discharge pollutants to waters of the United States.

277.   Plaintiff alleges that its members have been harmed by Defendants' acts and omissions described herein and have standing to bring this suit.

278.   Defendants' violations of the reporting requirements of the General Permit and the CWA are ongoing and continuous.

279.   By committing the acts and omissions alleged above, Defendants are subject to an assessment of civil penalties for each and every violation of the CWA occurring from June 21, 2021, to the present, pursuant to Sections 309(d) and 505 of the CWA, 33 U.S.C. §§ 1319(d), 1365, and 40 C.F.R. § 19.4.

280.   An action for injunctive relief under the CWA is authorized by Section 505(a) of the CWA. 33 U.S.C. § 1365(a). Continuing commission of the acts and omissions alleged above would irreparably harm Plaintiff and the citizens of the State of California, for which harm Plaintiff and citizens have no plain, speedy, or adequate remedy at law.

281.   An action for declaratory relief is authorized by 28 U.S.C. § 2201(a) because an actual controversy exists as to the rights and other legal relations of the Parties.

## VIII.   **RELIEF REQUESTED**

282.   Plaintiff respectfully requests that this Court grant the following relief:

a.      A Court order declaring that the Defendants have violated, and continue to be in violation, of Sections 301(a) and (b) of the Clean Water Act, 33 U.S.C. §§ 1311(a) and (b), for discharging pollutants from the Facility in violation of a permit issued pursuant to Section 402(p) of the CWA, 33 U.S.C. § 1342(p), for failing to meet effluent limitations which include BAT/BCT requirements, for failing to meet receiving water limitations, for failing to develop and implement an adequate SWPPP, for failing to comply with the monitoring provisions of the General Permit, for failing to submit accurate annual reports, for failing to timely submit ERA documentation, and for failing

to comply with the substantive and procedural requirements of the General Permit;

b.  A Court order enjoining Defendants from discharging pollutants in violation of an NPDES permit;

c.  A Court order requiring Defendants to implement affirmative injunctive measures designed to eliminate Defendants' violations of the substantive and procedural requirements of the General Permit and the Clean Water Act;

d.  A Court order assessing civil monetary penalties for each violation of the CWA at $66,712 per day per violation. *See* 33 U.S.C. §§ 1319(d) and 1365(a); Adjustment of Civil Monetary Penalties for Inflation, 40 C.F.R. § 19.4;

e.  A Court order awarding Plaintiff its reasonable costs of suit, including attorneys', witness', experts', and consultants' fees, as permitted by Section 505(d) of the Clean Water Act, 33 U.S.C. § 1365(d); and

f.  Any other relief as this Court may deem appropriate.

Dated: September 19, 2024                   Respectfully submitted,

<u>/s/ Erin A. Barlow</u>
Erin A. Barlow
Attorney for Plaintiff
Orange County Coastkeeper

Complaint                              43

# Exhibit A



ORANGE COUNTY
**COASTKEEPER**®

3151 Airway Avenue, Suite F-110
Costa Mesa, CA 92626
Phone 714-850-1965
www.coastkeeper.org

July 16, 2024

<u>**VIA CERTIFIED MAIL – Return Receipt Requested**</u>

Kenneth Dale Thornton
Chief Executive Officer
Thornton Steel & Iron Works, Inc.
1323 S. State College Parkway
Anaheim, CA 92806

Steve Braseny
President
Thornton Steel & Iron Works, Inc.
1323 S. State College Parkway
Anaheim, CA 92806

Tatiana Chapman
Agent for Service of Process
30211 Avenida De Las Banderas,
Suite 200
Rancho Santa Margarita, CA 92688

Kenneth Dale Thornton
2000 Lone Star Trail
Clarkdale, AZ 86324-3265

**Re:    NOTICE OF VIOLATIONS AND INTENT TO FILE SUIT UNDER THE FEDERAL WATER POLLUTION CONTROL ACT ("CLEAN WATER ACT") (33. U.S.C. §§ 1251 *et seq.*)**

Dear Mr. Thornton, Mr. Braseny, and Whom Else it May Concern:

I am writing on behalf of Orange County Coastkeeper ("Coastkeeper") regarding violations of the Clean Water Act[1] and California's General Industrial Storm Water Permit[2] (the "Storm Water Permit" or the "Permit") occurring at Thornton Steel & Iron Works, Inc. ("Thornton Steel") facility located at 1323 S. State College Parkway, Anaheim, CA 92806 (the "Facility"). The purpose of this letter (this "Notice Letter") is to put Thornton; Kenneth Dale Thornton, the CEO and CFO of Thornton and the landowner; and, Steve Braseny, President of Thornton and the Legally Responsible Person, (each a "Notice Recipient" and with Thornton Steel & Iron Works, Inc., the "Notice Recipients"), as the owner(s) and operator(s) of the Facility (collectively, the "Owners" and/or "Operators"),[3] on notice of the violations of the Storm Water Permit occurring at the Facility, including, but not limited to, discharges of polluted storm water from the Facility

---

[1] Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 et seq.
[2] National Pollution Discharge Elimination System ("NPDES") General Permit No. CAS000001, Water Quality Order No. 97-03-DWQ, as amended by Order No. 2014-0057-DWQ, as amended by Order 2015-0122-DWQ and Order No. 20XX-XXXX-DWQ.
[3] Reference to the singular includes a reference to the plural, and vice versa, where the context so permits.

into local surface waters in violation of the Permit. Violations of the Storm Water Permit are violations of the Clean Water Act. As explained below, the owner(s) and operator(s) are liable for violations of the Storm Water Permit and the Clean Water Act.

Section 505(b) of the Clean Water Act, 33 U.S.C. § 1365(b), requires that sixty (60) days prior to the initiation of a civil action under Section 505(a) of the Clean Water Act, 33 U.S.C. § 1365(a), a citizen must give notice of his/her intention to file suit to the alleged violator, the Administrator of the United States Environmental Protection Agency ("EPA"), the Regional Administrator of the EPA, the Executive Officer of the water pollution control agency in the State in which the violations occur, and, if the alleged violator is a corporation, the registered agent of the corporation. *See* 40 C.F.R. § 135.2(a)(1). This letter is being sent to you as the responsible owner(s) and/or operator(s) of the Facility or as the registered agent for these entities. This Notice Letter is issued pursuant to 33 U.S.C. §§ 1365(a) and (b) of the Clean Water Act to inform the Notice Recipients that Coastkeeper intends to file a federal enforcement action against them for violations of the Storm Water Permit and the Clean Water Act sixty (60) days or soon thereafter from the date of this Notice Letter.

## I.    BACKGROUND

### A.    <u>Orange County Coastkeeper</u>

Orange County Coastkeeper is a non-profit public benefit corporation organized under the laws of the State of California with its office at 3151 Airway Avenue, Suite F-110, Costa Mesa, California. Coastkeeper has over 6,300 members who live and/or recreate in and around the Orange County area, including Huntington Harbour, Anaheim Bay, and the greater Bolsa Chica Channel Watershed. Coastkeeper was founded in 1999 and is dedicated to protecting swimmable, drinkable, fishable water and promoting watershed resilience throughout Orange County. To further its goals, Coastkeeper actively seeks federal and state agency implementation of the Clean Water Act, and, where necessary, directly initiates enforcement actions on behalf of itself and its members.

Members of Coastkeeper live and own homes in the Bolsa Chica, Anaheim Bay, and Huntington Harbour Watershed and use and enjoy the waters to which the Facility discharges, including Bolsa Chica, Anaheim Bay and Huntington Harbour. Members of Coastkeeper use these waterways to participate in a variety of water sports and other activities, including, but not limited to, swimming, boating, kayaking, bird watching, wildlife viewing, biking, fishing, wading, standup paddle boarding, walking, and running. Additionally, members of Coastkeeper use the waters to engage in scientific studies including monitoring and restoration activities. The unlawful discharge of pollutants from the Facility into this watershed impairs Coastkeeper members' use and enjoyment of these waters. Further, unlawful discharges from the Facility are ongoing and continuous. Thus, the interests of Coastkeeper's members have been, are being, and will continue to be adversely affected by the Facility's failure to comply with the Clean Water Act and the Storm Water Permit.

Notice of Violation and Intent to File Suit
July 16, 2024
Page 3 of 21

B.    **The Owners and/or Operators of the Facility**

Information available to Coastkeeper indicates that Thornton Steel is the owner and operator of the Facility at all times relevant to this Notice Letter. Thornton Steel is currently an active California corporation. Thornton Steel's registered agent for service is Tatiana Chapman located at 30211 Avenida De Las Banderas, Suite 200, Rancho Santa Margarita, CA 92688. Thornton Steel's Storm Water Pollution Prevention Plan ("SWPPP ")indicates that Steve Braseny is the President and Legally Responsible Person. Thornton Steel's Statement of Information to the California Secretary of State identifies Kenneth Dale Thornton as the Chief Executive Officer and Chief Financial Officer of the Facility. Upon information and belief, Mr. Braseny, and Mr. Thornton are responsible corporate officers with knowledge and control of Thornton Steel's industrial activities giving rise to the Clean Water Act violations alleged herein.

Information available to Coastkeeper indicates Kenneth Dale Thornton is the owner of the real property located at 1323 S. State College Parkway, Anaheim, CA 92806. Information available to Coastkeeper indicates Kenneth Dale Thornton has been the owner of this property since at least 2006. A landowner may be liable for violations of the Clean Water Act where the owner has knowledge and control of the actions giving rise to such violations. *Puget Soundkeeper Alliance v. Cruise Terminals of America, LLC*, 216 F.Supp.3d 1198, 1213-14 (2015).

Collectively, the Facility Owner and/or Operators are the responsible parties under the Clean Water Act.  The Facility Owners and/or Operators have violated and continue to violate the procedural and substantive terms of the Storm Water Permit including, but not limited to, the illegal discharge of pollutants from the Facility into local surface waters.  As explained herein, the Facility Owners and/or Operators are liable for violations of the Storm Water Permit and the Clean Water Act.

C.    **The Facility's Storm Water Permit Coverage**

Certain classified facilities that discharge storm water associated with industrial activity are required to apply for coverage under the Storm Water Permit by submitting a NOI to the State Water Resources Control Board (the "State Board") to obtain Storm Water Permit coverage. *See* Permit, Section I(A)(12). Upon information and belief, Thornton Steel's Owners and/or Operators obtained Storm Water Permit coverage for the Facility on or about February 19, 2021.

The NOI for the Facility located at 1323 South State College Parkway (the "Thornton NOI") identifies the operator as Thornton Steel and Ironworks. The Thornton NOI lists the Facility size as 27,740 square feet with 11,000 square feet of industrial area exposed to storm water. The Waste Discharger Identification ("WDID") is 8 30I029099.

The Thornton NOI lists the Bolsa Chica Channel and Huntington Harbour as the Facility's receiving waters. The NOI lists a Primary Standard Industrial Classification ("SIC") code of 3446 (Architectural and Ornamental Metal Work). SIC code 3446 facilities must obtain Storm Water Permit coverage. *See* Storm Water Permit Attachment A, ¶ 2. SIC code 3446 facilities must analyze their storm water samples for zinc, nitrate + nitrite nitrogen ("N+N"), iron, aluminum, and

Notice of Violation and Intent to File Suit
July 16, 2024
Page 4 of 21

– like all other covered facilities – total suspended solids ("TSS"), oil and grease ("O&G"), pH, additional parameters that serve as indicators of the presence of all industrial pollutants likely to be present in discharges, additional applicable industrial parameters related to 303(d) listed impairments or approved Total Maximum Daily Loads ("TMDLs"), or additional parameters required by the California Regional Water Quality Control Board, Santa Ana Region (the "Santa Ana Regional Board" or the "Regional Board"). Storm Water Permit, Section XI(B)(6) and Table 2. The Facility's Storm Water Pollution Prevention Plan indicates that the Facility does not sample for pollutants outside its SIC code parameters, TSS, pH, and O&G. SWPPP Section 2.3.

### D.    Storm Water Pollution and the Waters Receiving Discharges from the Facility

With every significant rainfall event, millions of gallons of polluted storm water originating from industrial operations, such as the Facility, pour into storm drains and local waterways. The consensus among agencies and water quality specialists is that storm water pollution accounts for more than half of the total pollution entering surface waters each year. Such discharges of pollutants from industrial facilities contribute to the impairment of downstream waters and aquatic-dependent wildlife. These contaminated discharges can and must be controlled for the ecosystem to regain its health.

Polluted discharges from industrial manufacturing facilities, such as the Facility, can contain pH-affecting substances; metals, such as iron, magnesium, and aluminum; toxic metals, such as lead, zinc, nickel, cadmium, chromium – including hexavalent chromium, copper, arsenic, and mercury; chemical oxygen demand ("COD"); biological oxygen demand ("BOD"); TSS; total organic carbon ("TOC"); benzene; gasoline and diesel fuels; cyanide; ammonia; fuel additives; paint; coolants; antifreeze; N+N; trash; indicator bacteria; and O&G.

Upon and information and belief, discharges of storm water from the Facility enter the Orange County Municipal Separate Storm Sewer System ("MS4"). The MS4 system empties into the Bolsa Chica Channel and from there enters into nearby Anaheim Bay and Huntington Harbour (the "Receiving Waters"). The Bolsa Chica Channel is a tidally influenced Water of the United States. The Receiving Waters are ecologically sensitive areas. Although pollution and habitat destruction have drastically diminished once-abundant and varied species, these waters are still an essential habitat for dozens of fish and bird species as well as macro-invertebrate and invertebrate species, including rare and/or threatened aquatic species. Storm water and non-storm water contaminated with sediment, heavy metals, and other pollutants harm the special biological significance of the Receiving Waters, pose threats to the public, and dramatically affect the use and enjoyment of the surrounding environment.

The Santa Ana Regional Board adopted the Basin Plan for the Santa Ana Region (the "Santa Ana Basin Plan" or "Basin Plan") which identifies the "Beneficial Uses" of water bodies within the region. The beneficial uses for Huntington Harbour include: Navigation; Water Contact Recreation; Non-contact Water Recreation; Commercial and Sport Fishing; Wildlife Habitat; Rare, Threatened or Endangered Species; Spawning, Reproduction, and Development; and Marine Habitat. *See* Water Quality Control Plan for the Santa Ana Region ("Basin Plan") at

Notice of Violation and Intent to File Suit
July 16, 2024
Page 5 of 21

Table 3-1. The beneficial uses for Anaheim Bay, Outer Bay include: Navigation; Water Contact Recreation; Non-contact Water Recreation; Preservation of Biological Habitats of Special Significance; Wildlife Habitat; Rare, Spawning, Reproduction, and Development; and Marine Habitat. *Id*. Additionally, the beneficial uses for Anaheim Bay, Seal Beach National Wildlife Refuge include: Water Contact Recreation; Non-contact Water Recreation; Preservation of Biological Habitats of Special Significance; Wildlife Habitat; Rare, Spawning, Reproduction, and Development; Marine Habitat; and Estuarine Habitat. *Id*. Beneficial uses for Bolsa Bay include: Water Contact Recreation; Non-contact Water Recreation; Commercial and Sport Fishing; Preservation of Biological Habitats of Special Significance; Wildlife Habitat; Rare, Spawning, Reproduction, and Development; Marine Habitat; and Shellfish Harvesting. *Id*. Lastly, beneficial uses for Bolsa Chica Ecological Reserve include: Water Contact Recreation; Non-contact Water Recreation; Preservation of Biological Habitats of Special Significance; Wildlife Habitat; Rare, Spawning, Reproduction, and Development; Marine Habitat; and Estuarine Habitat. *Id*.

Pursuant to the Clean Water Act Section 303(d) list of impaired water bodies, the Bolsa Chica Channel is impaired for ammonia, pH, and indicator bacteria. Huntington Harbour is impaired for chlordane, copper, PCBs, toxicity, lead, and indicator bacteria. Anaheim Bay is impaired for nickel, toxicity, and PCBs. Polluted discharges from industrial sites, such as the Facility, contribute to the degradation of these already-impaired surface waters and aquatic dependent wildlife that depend on these waters.

## II.     THE FACILITY AND ASSOCIATED DISCHARGES OF POLLUTANTS

### A.     <u>The Facility Site Description and Industrial Activities</u>

The Facility is a metal fabrication facility. According to the Facility's SWPPP and other documents available to Coastkeeper, industrial activities at the Facility include welding and fabrication, cutting and grinding, spray painting and priming, vehicle maintenance and storage, and other industrial activities relating to delivery such as trucking and use of forklifts. Information available to Coastkeeper indicates that areas of industrial activity at the Facility include paint booth(s), wet saws and grinding stations, forming and fabricating stations, vehicle storage areas, material storage, and other finished product storage.

### B.     <u>Pollutants and Pollutant Sources Related to the Facility's Industrial Activities</u>

The areas of industrial activity and industrial activities at the Facility are sources of pollutants. The pollutants associated with the type of industrial activities at the Facility include, but are not limited to: pH-affecting substances, chromium, nickel, zinc, copper, cadmium, lead, aluminum, iron, N+N, anti-corrosive compounds, paints, solvents, dyes, lubricants, sealants, trash, O&G, sediment, and other suspended solids.

Information available to Coastkeeper indicates the Facility Owners and/or Operators have not properly developed and implemented the required best management practices ("BMPs") to address the pollutant sources and associated pollutants at the Facility. BMPs are necessary at the

Notice of Violation and Intent to File Suit
July 16, 2024
Page 6 of 21

Facility to prevent unauthorized non-storm water discharges, as well as the exposure of pollutants to precipitation and the subsequent discharge of polluted storm water from the Facility during rain events. As a result of the Facility Owners' and/or Operators' failure to develop and implement adequate BMPs, during rain events, storm water carries pollutants from the Facility into the Receiving Waters in violation of the Storm Water Permit and the Clean Water Act.

Information available to Coastkeeper also indicates that pollutants have been and continue to be discharged from the Facility as unauthorized non-storm water when washed, leaked, tracked, or generated as dust into the street, storm drain, and ultimately, the Receiving Waters. Information available to Coastkeeper indicates industrial materials and equipment are stored outside without adequate cover or containment and cleaning activities are conducted without adequate BMPs, resulting in discharges of polluted storm water and unauthorized non-storm water when materials are leaked, tracked, spilled, carried by wind, carried by irrigation runoff, or carried by other non-storm water discharges from the Facility, into the street and storm drain and, ultimately, into the Receiving Waters. Additionally, hazardous materials associated with industrial activities – including, but not limited to, waste wet saw and grinding dust, liquid storage and covered drums for metal shavings from grinding operations and chips from the paint booth – are stored without adequate secondary containment to prevent polluted storm water and prohibited non-storm water from discharging from the Facility and into the street and storm drain, which carries pollutants to the Receiving Waters. These activities are all significant pollutant sources at the Facility.

These illegal discharges of polluted storm water and non-storm water negatively impact Coastkeeper's members' use and enjoyment of the Receiving Waters by degrading the quality of the Receiving Waters and by posing risks to human health and aquatic life.

### C.    The Facility's Drainage Patterns and Discharge Locations

According to the Site Map uploaded by the Facility on February 19, 2021 and certified by Steve Braseny (the "Site Map"), the Facility contains roof drainage and sheet flow runoff that takes place in paved areas and driveways on site. *See* Site Map. Upon information and belief, the Facility's discharges drain to South State College Parkway along concrete swales and driveways, which discharge into the concrete gutter of the street, flow down South State College Parkway, and ultimately enter the MS4 system and flow to the Receiving Waters. *Id*.

The Facility reports one discharge location at 1323 South State College Parkway, Anaheim, CA 92806. *Id*. The Storm Water Permit requires permittees to collect samples from each drainage area at any and all discharge locations. *See* Storm Water Permit, Section XI.B.4.

## III.   VIOLATIONS OF THE CLEAN WATER ACT AND THE STORM WATER PERMITS

Congress enacted the Clean Water Act in 1972 in order to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251. The Clean Water Act prohibits the discharge of pollutants into United States waters except as authorized by the statute. 33 U.S.C. § 1311; *S.F. Baykeeper, Inc. v. Tosco Corp.*, 309 F.3d 1153, 1156 (9th Cir.

Notice of Violation and Intent to File Suit
July 16, 2024
Page 7 of 21

2002). The Clean Water Act is administered largely through the National Pollutant Discharge
Elimination System (NPDES) permit program. 33 U.S.C. § 1342. In 1987, the Clean Water Act
was amended to establish a framework for regulating storm water discharges through the NPDES
system. Water Quality Act of 1987, Pub. L. 100-4 § 405, 101 Stat. 7, 69 (1987) (codified at 33
U.S.C. § 1342 (p)); *see also Envt'l. Def. Ctr., Inc. v. EPA*, 344 F.3d 832, 840-41 (9th Cir. 2003)
(describing the problem of storm water runoff and summarizing the Clean Water Act's permitting
scheme). The discharge of pollutants without an NPDES permit, or in violation of an NPDES
permit, is illegal. *Ecological Rts. Found. v. Pac. Lumber Co.*, 230 F.3d 1141, 1145 (9th Cir. 2000).

Much of the responsibility for administering the NPDES permitting system has been
delegated to the states. *See* 33 U.S.C. § 1342(b), *see also* Cal. Water Code § 13370 (expressing
California's intent to implement its own NPDES permit program). The Clean Water Act authorizes
states with approved NPDES permit programs to regulate industrial storm water discharges
through individual permits issued to dischargers, as well as through the issuance of a single,
statewide general permit applicable to all industrial storm water dischargers. 33 U.S.C. § 1342(b).
Pursuant to Section 402 of the Clean Water Act, the Administrator of the EPA has authorized the
State Board to issue individual and general NPDES permits in California. 33 U.S.C. § 1342. The
State Board coordinates with the Regional Board, which has shared jurisdiction over the Facility
for state and federal water pollution control efforts.

In California, any person who discharges storm water associated with industrial activity
must comply with the terms of the Storm Water Permit in order to lawfully discharge pollutants.
*See* 33 U.S.C. §§ 1311(a), 1342; 40 C.F.R. § 122.26(c)(1). Facilities must strictly comply with all
of the terms and conditions of the Permit. A violation of the Permit is a violation of the Clean
Water Act. The Permit contains three primary and interrelated categories of requirements: (1)
discharge prohibitions, receiving water limitations, and effluent limitations – including numeric
effluent limitations ("NELs"); (2) SWPPP requirements; and (3) self-monitoring and reporting
requirements, with Exceedance Response Actions ("ERAs") required for pollutant concentration
levels above Numeric Action Levels ("NALs"). An Annual NAL exceedance occurs when the
average of all the analytical results for parameter from samples taken within a reporting year
exceeds the NAL value for that parameter. An instantaneous maximum NAL exceedance occurs
when two (2) or more analytical results from samples taken for any single parameter within a
reporting year exceed the instantaneous maximum NAL value or are outside of the instantaneous
maximum NAL range for pH. Storm Water Permit, Section XII.A.

Notice of Violation and Intent to File Suit
July 16, 2024
Page 8 of 21

A.     **Discharges of Polluted Storm Water and Non-Storm Water from the Facility in Violation of the Storm Water Permit's Receiving Water Limitations**

The Storm Water Permit prohibits storm water discharges and authorized non-storm water discharges that cause or threaten to cause pollution, contamination, or nuisance. Storm Water Permit, Section III(C). The Storm Water Permit also prohibits discharges that violate any discharge prohibition contained in the applicable Regional Board's Basin Plan or statewide water quality control plans and polices. Storm Water Permit, Section III(D). Furthermore, storm water discharges and authorized non-storm water discharges shall not adversely impact human health or the environment, and shall not cause or contribute to an exceedance of any water quality standards in any affected receiving water. Storm Water Permit, Sections VI(A)-(B).

The California Toxics Rule ("CTR") is an applicable water quality standard under the Storm Water Permit, the violation of which is a violation of Permit conditions. *Cal. Sportfishing Prot. Alliance v. Chico Scrap Metal, Inc.*, 2015 U.S. Dist. LEXIS 108314 at *21 (E.D. Cal. 2015). The CTR establishes numeric receiving water limits for toxic pollutants in California surface waters. 40 C.F.R. § 131.38. The CTR establishes maximum concentration numeric limits for, among other parameters, zinc – 0.12 mg/L and copper – 0.013 mg/L.[4] Coastkeeper puts the Facility Owners and/or Operators on notice that it has violated and continues to violate the numeric water quality standards in the CTR, and, by extension, the Clean Water Act, each time storm water and/or non-storm water discharges from the Facility with pollutant concentration levels in excess of CTR limits such that they contribute to an exceedance of the water quality standards.

The Basin Plan also sets forth water quality standards and prohibitions applicable to the Facility's discharges. The Basin Plan includes narrative toxicity standards which state: "[t]oxic substances shall not be discharged at levels that will bioaccumulate in aquatic resources to level[s] which are harmful to human health." Basin Plan, Water Quality Objectives. Further, "[t]he concentrations of toxic substances in the water column, sediments or biota shall not adversely affect beneficial uses." *Id.* Upon information and belief, the Facility's discharges include concentrations of metals and other pollutants that cause exceedances of these narrative water quality standards, which adversely impact aquatic resources, human health, and beneficial uses. These harmful discharges from the Facility are violations of the Storm Water Permit's Receiving Water Limitations. *See* Storm Water Permit, Section VI.

Coastkeeper puts the Facility Owners and/or Operators on notice that they are violating the Storm Water Permit's Receiving Water Limitations each time polluted storm water and non-storm water is discharged from the Facility with elevated pollutant concentration levels. *See, e.g.*, Exhibit 1. The Storm Water Permit Receiving Water Limitations are independent Permit requirements with which the Facility must comply. Violations of the Receiving Water Limitations described in this Notice Letter are ongoing and will continue each time contaminated storm water or non-storm water is discharged from the Facility in violation of the Permit's Receiving Water Limitations. Each time discharges of storm water from the Facility cause or contribute to a violation of an

---

[4] This assumes a water hardness calculation of 100 mg/L. The CTR numeric limits are expressed as dissolved metal concentrations.

Notice of Violation and Intent to File Suit
July 16, 2024
Page 9 of 21

applicable water quality standard is a separate and distinct violation of Permit Receiving Water Limitation VI(A) and, in turn, Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a). Each time discharges from the Facility adversely impact human health or the environment is a separate and distinct violation of Permit Receiving Water Limitation VI(B) and, in turn, Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a). Each time discharges from the Facility threaten to cause pollution or a public nuisance is a separate and distinct violation of Permit Receiving Water Limitation VI(C) and, in turn, Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a).

Coastkeeper will update the dates of violation when additional information and data becomes available. The Facility Owners and/or Operators are subject to civil penalties for all violations of the Clean Water Act occurring since July 15, 2019.

## B. Discharges of Polluted Storm Water from the Facility in Violation of the Storm Water Permit's Technology Based Effluent Limitations

Effluent Limitation V(A) of the Permit requires dischargers to reduce or prevent pollutants in their storm water discharges through implementation of BMPs that achieve Best Available Technology Economically Achievable ("BAT") for toxic[5] and non-conventional pollutants and Best Conventional Pollutant Control Technology ("BCT") for conventional pollutants.[6] To meet the BAT/BCT standard, dischargers must implement and improve BMPs as necessary to reduce or prevent pollutants in discharge. Storm Water Permit, Sections X(H)1-2 and XII.

The Storm Water Permit incorporates benchmark levels established by the EPA as NALs, which benchmarks are relevant and objective standards for evaluating whether a permittee's BMPs achieve compliance with BAT/BCT standards as required by Permit Effluent Limitation V(A).[7]

---

[5] Toxic pollutants are listed at 40 C.F.R. § 401.15 and include copper, benzene, chromium, cyanides, arsenic, lead, silver, and zinc, among others.

[6] Conventional pollutants are listed at 40 C.F.R. § 401.16 and include biochemical oxygen demand, TSS, O&G, pH, and fecal coliform.

[7] *See United States Environmental Protection Agency (EPA) National Pollutant Discharge Elimination System (NPDES) Multi-Sector General Permit for Stormwater Discharges Associated with Industrial Activity (MSGP) Authorization to Discharge Under the National Pollutant Discharge Elimination System*, as modified effective February 26, 2009 ("Multi-Sector Permit"); *see also*, 65 Federal Register 64839 (2000).

Notice of Violation and Intent to File Suit
July 16, 2024
Page 10 of 21

Information available to Coastkeeper, including its review of publicly available information including storm water samples collected by the Facility, indicates that BMPs that achieve BAT/BCT have not been implemented at the Facility. For example, storm water discharges from the Facility contain concentrations of pollutants associated with the Facility's industrial activities above NALs. The table in Exhibit 1 sets forth the results of samples collected by the Facility Owners and/or Operators and Coastkeeper since the 2019-2024 reporting years. The Facility is in ERA Level 1 for aluminum, iron, zinc, and N+N as of 2023. The ongoing exceedances of NALs demonstrate that the Facility Owners and/or Operators have failed and continue to fail to develop and/or implement BMPs at the Facility as required to achieve compliance with the BAT/BCT standards.

Coastkeeper puts the Facility Owners and/or Operators on notice that the Storm Water Permit Effluent Limitations are violated each time storm water discharges from the Facility. *See, e.g.*, Exhibit 2 (setting forth dates of significant rain events near the Facility).[8] These violations are ongoing and will continue each day the Facility Owners and/or Operators operate without developing and/or implementing BMPs that achieve compliance with the BAT/BCT standards. Each day the Facility Owners and/or Operators operate in violation of Effluent Limitation V(A) of the Permit is a separate and distinct violation of the Storm Water Permit and Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a). The Facility Owners and/or Operators are subject to civil penalties for all violations of the Clean Water Act occurring since July 15, 2019.

## C.    Discharges of Unauthorized Non-Storm Water from the Facility in Violation of the Storm Water Permit's Discharge Prohibitions

Except as authorized by Section IV of the Storm Water Permit, permittees are prohibited from discharging materials other than storm water (non-storm water discharges) either directly or indirectly to waters of the United States. Prohibited non-storm water discharges must be either eliminated or permitted by a separate NPDES permit. *See* Storm Water Permit, Discharge Prohibition III.B.

Information available to Coastkeeper indicates that unauthorized non-storm water discharges occur at the Facility due to inadequate BMP development and/or implementation necessary to prevent these discharges. For example, unauthorized non-storm water discharges occur at the Facility when high pressure or power washing activities, spills, leaks, dust-generating activities, and track-out occur and result in pollutants leaving the Facility and entering the street, storm drain, and ultimately, Receiving Waters. The Facility Owners and/or Operators conduct these activities without adequate BMPs to prevent related non-storm water discharges. Non-storm water discharges resulting from these activities are not from sources listed among authorized non-

---

[8] Dates of significant rain events are measured at the Santa Ana John Wayne Airport station, based on data recorded by NOAA. A significant rain event is defined by EPA as a rainfall event generating 0.1 inches or more of rainfall, which generally results in discharges at a typical industrial facility. There were at least 44 significant rain events from February 19, 2021 to present, as measured by the rain gauge in Anaheim, CA.

Notice of Violation and Intent to File Suit
July 16, 2024
Page 11 of 21

storm water discharges in Section IV(A) of the Storm Water Permit and, thus, are always prohibited under the Storm Water Permit.

Coastkeeper puts the Facility Owners and/or Operators on notice that the Storm Water Permit Discharge Prohibitions are violated each time non-storm water is discharged from the Facility into the street, storm drain, and ultimately, Receiving Waters. *See* Storm Water Permit, Discharge Prohibition III(B). These discharge violations are ongoing and will continue until the Facility Owners and/or Operators develop and implement BMPs that prevent prohibited non-storm water discharges or obtain separate NPDES permit coverage. Each time the Facility Owners and/or Operators discharge prohibited non-storm water in violation of Discharge Prohibition III(B) of the Storm Water Permit is a separate and distinct violation of the Storm Water Permit and section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a). Coastkeeper will update the number and dates of violations when additional information becomes available. The Facility Owners and/or Operators are subject to civil penalties for all violations of the Clean Water Act occurring since July 15, 2019.

### D.    Failure to Develop, Implement, and/or Revise an Adequate Storm Water Pollution Prevention Plan

The Storm Water Permit requires permittees to develop and implement Storm Water Pollution Prevention Plans ("SWPPPs") prior to conducting, and in order to continue, industrial activities. The specific SWPPP requirements of the Permit are set out below.

#### 1.    Storm Water Permit SWPPP Requirements

Section X of the Storm Water Permit requires dischargers to have developed and implemented a SWPPP that meets all of the requirements of the Permit. *See also* Storm Water Permit, Appendix 1. The objectives of the SWPPP requirements are to identify and evaluate all sources of pollutants that may affect the quality of industrial storm water discharges and to implement site-specific BMPs to reduce or prevent pollutants in industrial storm water discharges. *See* Storm Water Permit, Section X(C).

The SWPPP must include, among other things, a narrative description and summary of all areas of industrial activity, potential sources of pollutants and potential pollutants; a site map indicating the storm water conveyance system, associated points of discharge, direction of flow, areas of actual and potential pollutant contact, including the extent of pollution-generating activities, nearby water bodies, and structural control measures; a description of the BMPs developed and implemented to reduce or prevent pollutants in storm water discharges and authorized non-storm water discharges necessary to comply with the Storm Water Permit; the identification of non-storm water discharges and elimination of unauthorized non-storm water discharges; the location where industrial materials are being shipped, stored, received, and handled, as well as the typical quantities of such materials and the frequency with which they are handled; a description of dust and particulate-generating activities; an evaluation of areas where spills and leaks can likely occur; and the identification of team members and their current

Notice of Violation and Intent to File Suit
July 16, 2024
Page 12 of 21

responsibilities for developing and implementing the SWPPP. Storm Water Permit, Section X(A)-(H).

Further, the Permit requires the discharger to evaluate the SWPPP on an annual basis and revise it as necessary to ensure compliance. Storm Water Permit, Section X(A)-(B). The Permit also requires that the discharger conduct an annual comprehensive site compliance evaluation that includes: a review of all visual observation records, inspection reports, and sampling and analysis results; a visual inspection of all areas of industrial activity and potential pollutant sources for evidence of, or the potential for, pollutants entering the drainage system; a review and evaluation of all BMPs to determine whether the BMPs are adequate, properly implemented and maintained, or whether additional BMPs are needed; and a visual inspection of equipment needed to implement BMPs. Storm Water Permit, Section X(A) and Section XV.

## 2. The Facility Owners and/or Operators Have Violated and Continue to Violate the Storm Water Permit SWPPP Requirements

Information available to Coastkeeper indicates that the Facility Owners and/or Operators have been and continue to conduct operations at the Facility with an inadequately developed, implemented, and/or improperly revised SWPPP. The Facility Owners and/or Operators have failed to adequately revise the SWPPP in response to ongoing high concentrations of pollutants. For example, the SWPPP fails to describe (i) the locations where each industrial material is stored, received, shipped, and handled with specificity and (ii) the typical quantities and handling frequency of each industrial material as required by the Permit. The SWPPP also fails to describe the responsibilities, duties, and activities of each SWPPP team member in accordance with the Permit. Nor does the SWPPP adequately describe, at a minimum, the Facility's (i) industrial processes, listing only general information such as welding and fabrication (ii) dust and particulate generating activities – the SWPPP states that all dust and particulate generating areas are on the site map, but the Permit requires a description of all industrial activities that generate a significant amount dust or particulate – controlled or not to be *described* and included in the site map, (iii) areas where spills and leaks can occur, (iv) evaluation of non-storm water discharges, and (v) BMP descriptions, all in violation of the Permit. *See* Permit, Section X. Additionally, the Facility's Site Map fails to depict (i) drainage areas, (ii) storm water collection and conveyance systems, (iii) structural control measures, (iv) impervious areas, (v) municipal storm drain inlets, (vi) locations where materials are directly exposed to precipitation, (vii) locations where identified significant spills or leaks have occurred, and (viii) other areas and items as required by the Permit. *Compare* Site Maps *with* Permit, Section X(E).

Accordingly, the Facility Owners and/or Operators have failed and continue to fail to adequately develop, implement, and/or revise a SWPPP in violation of the Storm Water Permit. *See* Permit, Section X. Each day the Facility operates with an inadequately developed, implemented, and/or improperly revised SWPPP is a separate and distinct violation of the Storm Water Permit and the Clean Water Act. The Facility Owners and/or Operators have been in daily and continuous violation of the Storm Water Permit's SWPPP requirements since at least February 19, 2021 These violations are ongoing, and Coastkeeper will include additional violations when

Notice of Violation and Intent to File Suit
July 16, 2024
Page 13 of 21

information becomes available. The Facility Owners and/or Operators are subject to civil penalties for all violations of the Clean Water Act occurring since July 15, 2019.

**E.    Failure to Develop, Implement, and/or Revise an Adequate Monitoring Implementation Plan and Perform Monitoring**

The Storm Water Permit requires permittees to develop and implement a storm water Monitoring Implementation Plan ("MIP") prior to conducting, and in order to continue, industrial activities. The specific MIP requirements of the Permit are set out below.

**1.    Permit MIP Requirements**

Sections X(I) and XI(A)-XI(D) of the Permit require facility operators to develop and implement an adequate MIP that meets all of the requirements of the Permit. The objective of the MIP is to detect and measure the concentrations of pollutants in a facility's discharge, and to ensure compliance with the Permit's Discharge Prohibitions, Effluent Limitations, and Receiving Water Limitations. *See* Permit, Section XI. An adequate MIP ensures that BMPs are effectively reducing and/or eliminating pollutants at the facility and is evaluated and revised whenever appropriate to ensure compliance with the Storm Water Permit. *See id.*

Section XI(A) of the Permit requires visual observations during dry weather at least once each month, and storm water visual observations at the same time sampling occurs at a discharge location. Monthly visual observations must include observations of any non-storm water discharges (NSWDs), all outdoor industrial equipment and activities, BMPs, and all potential sources of industrial pollution. Storm Water Permit, Section XI(A)(1)(a). Storm water observations must document the presence of any floating and suspended material, O&G, discolorations, turbidity, odor, trash/debris, and the source of any pollutants. Storm Water Permit, Section XI(A)(2). Dischargers must document and maintain records of observations, observation dates, locations observed, and responses taken to reduce or prevent pollutants in storm water discharges. Storm Water Permit, Section XI(A)(3).

Under the IGP, permittees are required to "collect and analyze storm water samples from two (2) QSEs within the first half of each reporting year (July 1 to December 31), and two (2) QSEs within the second half of each reporting year (January 1 to June 30)." IGP, Section XI.B.2. The samples must be analyzed for TSS, pH, O&G, and additional parameters identified on a facility-specific basis that serve as indicators of the presence of all industrial pollutants identified in the pollutant source assessment – in addition to those required under the SIC code and related to TMDLs. Storm Water Permit, Section XI(B)(6). Section XI(B)(6)(c) of the Permit requires permittees to analyze samples for pollutants associated with industrial operations. Section XI(B)(6) of the Permit also requires dischargers to analyze storm water samples for additional applicable industrial parameters related to receiving waters with 303(d) listed impairments, or approved Total Maximum Daily Loads. Section XI(B)(11) of the Permit, among other requirements, provides that permittees must submit all sampling and analytical results for all samples via SMARTS within thirty days of obtaining all results for each sampling event.

Notice of Violation and Intent to File Suit
July 16, 2024
Page 14 of 21

### 2. The Facility Owners and/or Operators Have Violated and Continue to Violate the Storm Water Permit MIP Requirements

The Facility Owners and/or Operators have been and continue to conduct operations at the Facility with an inadequately developed, implemented, and/or improperly revised MIP.

For example, the Facility Owners and/or Operators have failed and continue to fail to collect storm water discharge samples as required. In the 2021-2022 reporting year, the Facility failed to collect a single storm water sample. The Facility claimed that not a single QSE occurred during the 2021-2022 reporting year that produced a discharge during business hours. In 2022-2023, the Facility failed to collect any storm water discharge samples in the first half of the reporting year. Again, the Facility claimed that there were insufficient QSEs that occurred during 2022-2023 during business hours. Finally, in the 2023-2024 reporting year, the Facility once again failed to collect any storm water discharge samples. The only samples from the Facility are two samples from the second half of the 2022-2023 reporting year. Thus, in no instance has the Facility collected samples from the required number of QSEs in a reporting year.

Based on climatological data obtained from NOAA, there were additional opportunities to sample significant rain events during each reporting year. *See* Ex. 2. Further, Coastkeeper staff observed, documented, and collected samples of discharge from the Facility on multiple occasions during which the Facility failed to sample – including on March 28, 2022, and February 24, 2023. *See* Ex. 1. Results from Coastkeeper's samples indicate the Facility's storm water has ongoing exceedances of NALs and/or CTR values for multiple parameters. *See* Ex. 1.

Accordingly, the Facility Owners and/or Operators have failed and continue to fail to adequately develop, implement, and/or revise an MIP, in violation of the Storm Water Permit's MIP requirements. Each day the Facility operates with an inadequately developed, implemented, and/or improperly revised MIP is a separate and distinct violation of the Storm Water Permit and the Clean Water Act. The Facility Owners and/or Operators have been in daily and continuous violation of the Storm Water Permit MIP requirements since at least July 15, 2019. These violations are ongoing, and Coastkeeper will include additional violations when information becomes available. The Facility Owners and/or Operators are subject to civil penalties for all violations of the Clean Water Act occurring since July 15, 2019.

### F. Failure to Comply with the Storm Water Permit's Exceedance Response Actions Requirements

#### 1. Permit Exceedance Response Requirements

Under the Storm Water Permit, facility operators are required to perform Exceedance Response Actions ("ERAs") as appropriate whenever sampling indicates NAL exceedances. An annual NAL exceedance occurs when the average of all the analytical results for a parameter from samples taken within a reporting year exceeds the annual NAL value for that parameter. An instantaneous maximum NAL exceedance occurs when two (2) or more analytical results from samples taken for any single parameter within a reporting year exceed the instantaneous maximum

Notice of Violation and Intent to File Suit
July 16, 2024
Page 15 of 21

NAL value or are outside of the instantaneous maximum NAL range for pH. Storm Water Permit XII(A). At the beginning of a discharger's Storm Water Permit coverage, the discharger has "Baseline" status. Storm Water Permit XII(B). Beyond Baseline status, there are two ERA levels: Level 1 and Level 2. Storm Water Permit XII(C)-(D). If a discharger enters Level 1 for exceedances of any constituent in a reporting year, that facility must prepare a Level 1 ERA Evaluation and Report to adequately address the polluted discharges. Storm Water Permit XII(C). Should the facility's sample results exceed NALs for a second consecutive year for the same constituent, the facility must prepare a Level 2 ERA Action Plan and Technical Report requiring further BMPs to address the exceedances. Storm Water Permit XII(D). Level 1 and Level 2 ERA reports and plans must be submitted via SMARTS to the State Board. Storm Water Permit XII(C)-(D). Dischargers in Level 1 or Level 2 status may return to Baseline if the requisite corrective actions are implemented and proven effective via storm water sampling, as further specified in the Permit. Storm Water Permit XII(C)(2)(b) and XII(D)(4).

## 2. The Facility Owners and/or Operators Have Violated and Continue to Violate the Storm Water Permit's Exceedance Response Requirements

Based on the limited sampling data submitted by the Facility Owners and/or Operators the Facility triggered Level 1 status during the 2022-2023 reporting year for aluminum, iron, zinc, and N+N. The Facility Owners and/or Operators were required to (i) complete a Level 1 ERA Evaluation by October 1, 2023, (ii) prepare and submit a Level 1 ERA Report to SMARTS by January 1, 2024, and (iii) amend the SWPPP accordingly with revisions uploaded to SMARTS by January 1, 2024. The Facility Owners and/or Operators uploaded a Level 1 Report on April 15, 2024 and have not amended the SWPPP since 2021. The ERA Report failed to sufficiently evaluate pollutant issues and suggested only minor and vague housekeeping changes. The Facility's failure to upload a sufficient Level 1 ERA Evaluation results in at least 289 violations and is ongoing. The Facility's continuous failure to upload a revised SWPPP has resulted in at least 197 violations and is ongoing.

Information available to Coastkeeper, indicates that the Facility has failed to implement the BMPs described in its Level 1 ERA documents. Further, Coastkeeper's samples indicate continued, high exceedances of iron, zinc, and N+N, amongst other parameters, indicating a failure to comply with the Storm Water Permit's requirements to utilize an iterative process for determining and improving BMPs.

Accordingly, the Facility Owners and/or Operators have failed and continue to fail to take Exceedance Response Actions as required by Section XII of the Permit. Each day the Facility operates without submitting and implementing all required ERA reports is a separate and distinct violation of the Storm Water Permit and the Clean Water Act. The Facility Owners and/or Operators have been in daily and continuous violation of the Storm Water Permit Exceedance Response Actions requirements since at least October 1, 2023, the Level 1 ERA Evaluation deadline resulting in at least 289 violations. These violations are ongoing, and Coastkeeper will include additional violations when information becomes available. The Facility Owners and/or Operators are subject to civil penalties for all violations of the Clean Water Act occurring since July 15, 2019.

Notice of Violation and Intent to File Suit
July 16, 2024
Page 16 of 21

### G.    Failure to Comply with the Storm Water Permit's Reporting Requirements

Section XVI of the Permit requires a permittee to submit an Annual Report to the Regional Board by July 15 of each year. The Annual Report includes a checklist that indicates whether the discharger has complied with all of the requirements of the Permit, an explanation for any non-compliance, an identification of all SWPPP revisions, and the date of the Annual Evaluation. *See* Permit, Section XVI. Annual Reports are certified by the Legally Responsible Person under penalty of perjury.

The Facility uploaded multiple insufficient and inaccurate reports. For example, the Facility states that there were insufficient discharges during business hours to obtain samples despite evidence available to Coastkeeper to the contrary, including our own sampling. Given that the Facility Owners and/or Operators have submitted an incomplete and/or incorrect Annual Report that fails to comply with the Storm Water Permit, the Facility Owners and/or Operators are in daily violation of the Storm Water Permit. Each day the Facility Owners and/or Operators conduct operations at the Facility without reporting as required by the Storm Water Permit constitutes a separate and distinct violation of the Storm Water Permit and Section 301(a) of the Clean Water Act, 33 U.S.C. §1311(a). The Facility Owners and/or Operators have been in daily and continuous violation of the Storm Water Permit's reporting requirements every day since at least July 15, 2019. These violations are ongoing, and Coastkeeper will include additional violations when information becomes available. The Facility Owners and/or Operators are subject to civil penalties for all violations of the Clean Water Act occurring since July 15, 2019.

## IV.    RELIEF SOUGHT FOR VIOLATIONS OF THE CLEAN WATER ACT

Pursuant to Section 309(d) of the Clean Water Act, 33 U.S.C. § 1319(d), and the Adjustment of Civil Monetary Penalties for Inflation, 40 C.F.R. § 19.4 (1997), each separate violation of the Clean Water Act subjects the violator to a penalty of up to $64,619 per day per violation. *See* 33 U.S.C. §§ 1319(d) and 1365(a); Adjustment of Civil Monetary Penalties for Inflation, 40 C.F.R. § 19.4. In addition to civil penalties, Coastkeeper will seek: injunctive relief preventing further violations of the Clean Water Act pursuant to Sections 505(a) and (d), 33 U.S.C. § 1365(a) and (d); declaratory relief; and other such relief as permitted by law. Lastly, pursuant to Section 505(d) of the Clean Water Act, 33 U.S.C. § 1365(d), Coastkeeper will seek to recover its costs, including attorneys' and experts' fees, associated with this enforcement action.

Notice of Violation and Intent to File Suit
July 16, 2024
Page 17 of 21

## V.    CONCLUSION

Coastkeeper is willing to discuss effective remedies for the violations described in this Notice Letter. If the Notice Recipients wish to pursue such discussions, we suggest that you initiate those discussions immediately. Upon expiration of the 60-day notice period, Coastkeeper intends to file a citizen suit under Section 505(a) of the Clean Water Act to prevent ongoing violations of the Clean Water Act at the Facility. If you wish to pursue settlement discussions, please contact Coastkeeper's legal counsel:

> Orange County Coastkeeper
> Barry Lee
> barry@coastkeeper.org
> 3151 Airway Avenue
> Costa Mesa, CA 92626
> (714) 850-1965

Sincerely,

Barry Lee
Counsel for Orange County Coastkeeper

Notice of Violation and Intent to File Suit
July 16, 2024
Page 18 of 21

## SERVICE LIST

<u>VIA U.S. CERTIFIED MAIL – Return Receipt Requested</u>

Merrick B. Garland
U.S. Attorney General
U.S. Department of Justice
950 Pennsylvania Avenue, N.W.
Washington, D.C. 20530-001

Martha Guzman
Regional Administrator
U.S. Environmental Protection Agency
Region IX
75 Hawthorne Street
San Francisco, California 94105

Michael S. Regan
Administrator
U.S. Environmental Protection Agency
William Jefferson Clinton Building
1200 Pennsylvania Avenue, N.W.
Washington, D.C. 20460

Jayne Joy
Executive Officer
Regional Water Quality Control Board
Santa Ana Region
3737 Main Street, Suite 500
Riverside, California 92501

Eileen Sobeck
Executive Director
State Water Resources Control Board
P.O. Box 100
Sacramento, California 95812-0100

Notice of Violation and Intent to File Suit
July 16, 2024
Page 19 of 21

## EXHIBIT 1

Thornton Steel & Iron Works
1323 S State College Pkwy, Anaheim, CA 92806

| Date of Sample Collection | Out fall | Collected by: | Parameter | Result | Unit | NAL | NAL/NEL Exceedance |
|---|---|---|---|---|---|---|---|
| No Samples Reported by Thornton for 2019-2020 Reporting Year | | | | | | | |
| No Samples Reported by Thornton for 2020-2021 Reporting Year | | | | | | | |
| 2021-2022 Reporting Year | | | | | | | |
| 3/28/22 | SP1 | OCCK | O&G | 16 | mg/L | 15 | 1 |
| 3/28/22 | SP1 | OCCK | Fe | 1.2 | mg/L | 1 | .2 |
| 3/28/22 | SP1 | OCCK | Zn | .36 | mg/L | .36 | .1 |
| 3/28/22 | SP1 | OCCK | N+N | .84 | mg/L | .68 | 1.6 |
| 2022-2023 Reporting Year | | | | | | | |
| 1/30/23 | SP1 | Thornton | Al | .89 | mg/L | .75 | .14 |
| 1/30/23 | SP1 | Thornton | Fe | 2.4 | mg/L | 1 | 1.4 |
| 1/30/23 | SP1 | Thornton | Zn | .32 | mg/L | .26 | .6 |
| 1/30/23 | SP1 | Thornton | N+N | 3.7 | mg/L | .68 | 3.02 |
| 2/24/23 | SP1 | OCCK | TSS | 110 | mg/L | 100 | 10 |
| 2/24/23 | SP1 | OCCK | Al | 1.8 | mg/L | .75 | 1.05 |
| 2/24/23 | SP1 | OCCK | Cu | .059 | mg/L | .0332 | .0258 |
| 2/24/23 | SP1 | OCCK | Fe | 17 | mg/L | 1 | 16 |
| 2/24/23 | SP1 | OCCK | Zn | 1.2 | mg/L | .26 | .94 |

Notice of Violation and Intent to File Suit
July 16, 2024
Page 20 of 21

| 2/24/23 | SP1 | OCCK | N+N | 7.8 | mg/L | .68 | 7.12 |
|---------|-----|----------|-----|-----|------|-----|------|
| 3/15/23 | SP1 | Thornton | Al | .93 | mg/L | .75 | .18 |
| 3/15/23 | SP1 | Thornton | Fe | 13 | mg/L | 1 | 12 |
| 3/15/23 | SP1 | Thornton | Zn | .72 | mg/L | .26 | .98 |
| No Samples Reported by Thornton for 2023-2024 Reporting Year ||||||||

Notice of Violation and Intent to File Suit
July 16, 2024
Page 21 of 21

# EXHIBIT 2

## Thornton Steel & Iron Works

1323 S State College Pkwy, Anaheim, CA 92806

This chart includes storm events producing at least 0.1 inches of rainfall in a 24-hour period using rain gauge data provided by NOAA located at Lat: 33.8647° N Lon: 117.8425° since February 19, 2021.

| Date | Rainfall in Inches | Date | Rainfall in Inches |
|---|---|---|---|
| 3/3/2021 | .39 | 3/20/2022 | .12 |
| 3/10/2021 | .60 | 3/28/2022 | .60 |
| 3/11/2021 | .10 | 4/22/2022 | .21 |
| 3/15/2021 | .15 | 9/10/2022 | .28 |
| 10/23/2021 | .10 | 10/16/2022 | .16 |
| 10/25/2021 | .20 | 11/8/2022 | 1.62 |
| 12/14/2021 | 1.38 | 12/11/2022 | 1.33 |
| 12/23/2021 | .36 | 12/28/2022 | .42 |
| 12/26/2021 | .42 | 12/31/2022 | .21 |

| Date | Rainfall in Inches | Date | Rainfall in Inches |
|---|---|---|---|
| 1/1/2023 | 1.1 | 1/3/2024 | .25 |
| 1/3/2023 | .16 | 1/20/2024 | .58 |
| 1/5/2023 | 1.06 | 2/1/2024 | 1.59 |
| 1/10/2023 | 1.18 | 2/4/2024 | 1.22 |
| 1/14/2023 | .94 | 2/19/2024 | .20 |
| 1/16/2023 | 1.21 | 3/2/2024 | .31 |
| 1/20/2023 | .24 | 3/6/2024 | .89 |
| 2/23/2023 | .25 | 3/23/2024 | .32 |
| 3/10/2023 | .65 | 3/30/2024 | 1.43 |
| 3/14/2023 | .29 | 4/13/2024 | .20 |
| 3/20/2023 | .35 | | |
| 3/29/2023 | 1.02 | | |
| 5/4/2023 | 1.43 | | |
| 8/20/2023 | 1.26 | | |
| 11/15/2023 | .13 | | |
| 12/21/2023 | .48 | | |